## STONE, WARDEN *v.* POWELL

No. 74–1055.   Argued February 24, 1976—Decided July 6, 1976*

---

*Together with No. 74–1222, *Wolff, Warden* v. *Rice,* on certiorari to the United States Court of Appeals for the Eighth Circuit.

*Robert R. Granucci,* Deputy Attorney General of California, argued the cause for petitioner in No. 74–1055. With him on the briefs were *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *Edward P. O'Brien,* Assistant Attorney General, and *Clifford K. Thompson, Jr., Thomas A. Brady,* and *Ronald E. Niver,* Deputy Attorneys General. *Melvin Kent Kammerlohr,* Assistant Attorney General of Nebraska, argued the cause for petitioner in No. 74–1222. With him on the brief was *Paul L. Douglas,* Attorney General.

*Robert W. Peterson,* by appointment of the Court, 423 U. S. 817, argued the cause and filed a brief for respondent in No. 74–1055. *William C. Cunningham* argued the cause for respondent in No. 74–1222. With him on the brief was *J. Patrick Green.*†

---

† Briefs of *amici curiae* urging reversal in No. 74–1222 were filed by *Bruce E. Babbitt,* Attorney General, *Shirley H. Frondorf,* and *Frank T. Galati,* Assistant Attorneys General, and *William J. Schafer*

MR. JUSTICE POWELL delivered the opinion of the Court.

Respondents in these cases were convicted of criminal offenses in state courts, and their convictions were affirmed on appeal. The prosecution in each case relied upon evidence obtained by searches and seizures alleged by respondents to have been unlawful. Each respondent subsequently sought relief in a Federal District Court by filing a petition for a writ of federal habeas corpus under

III, for the State of Arizona; by *Arthur K. Bolton*, Attorney General, *Robert S. Stubbs II*, Chief Deputy Attorney General, *Richard L. Chambers*, Deputy Attorney General, and *G. Thomas Davis*, Senior Assistant Attorney General, for the State of Georgia; by *Theodore L. Sendak*, Attorney General, and *Donald P. Bogard*, Assistant Attorney General, of Indiana, and *Richard C. Turner*, Attorney General of Iowa, for the States of Indiana and Iowa; and by *Vernon B. Romney*, Attorney General, and *William W. Barrett*, Assistant Attorney General, for the State of Utah.

*John J. Cleary* filed a brief for the California Public Defenders Assn. as *amicus curiae* urging affirmance in No. 74–1055. Briefs of *amici curiae* urging affirmance in No. 74–1222 were filed by *Mary M. Kaufman* for the National Alliance Against Racist and Political Repression; by *Henry W. McGee, Jr.*, for the National Conference of Black Lawyers; by *Jonathan M. Hyman* for the National Lawyers' Guild et al.; and by *Theodore A. Gottfried* and *Robert E. Davison* for the National Legal Aid and Defender Assn.

*Leon Friedman, Melvin L. Wulf*, and *Joel M. Gora* filed a brief for the American Civil Liberties Union as *amicus curiae* in both cases. Briefs of *amici curiae* in No. 74–1222 were filed by *Robert L. Shevin*, Attorney General, and *Stephen R. Koons*, Assistant Attorney General, for the State of Florida; by *William F. Hyland*, Attorney General, *David S. Baime, John DeCicco*, and *Daniel Louis Grossman*, Deputy Attorneys General, for the State of New Jersey; by *Louis J. Lefkowitz*, Attorney General, *Samuel A. Hirshowitz*, First Assistant Attorney General, and *Lillian Z. Cohen*, Assistant Attorney General, for the State of New York; and by *Frank Carrington, Fred E. Inbau, Wayne W. Schmidt, James R. Thompson*, and *William K. Lambie* for Americans for Effective Law Enforcement, Inc., et al.

28 U. S. C. § 2254. The question presented is whether a federal court should consider, in ruling on a petition for habeas corpus relief filed by a state prisoner, a claim that evidence obtained by an unconstitutional search or seizure was introduced at his trial, when he has previously been afforded an opportunity for full and fair litigation of his claim in the state courts. The issue is of considerable importance to the administration of criminal justice.

I

We summarize first the relevant facts and procedural history of these cases.

A

Respondent Lloyd Powell was convicted of murder in June 1968 after trial in a California state court. At about midnight on February 17, 1968, he and three companions entered the Bonanza Liquor Store in San Bernardino, Cal., where Powell became involved in an altercation with Gerald Parsons, the store manager, over the theft of a bottle of wine. In the scuffling that followed Powell shot and killed Parsons' wife. Ten hours later an officer of the Henderson, Nev., Police Department arrested Powell for violation of the Henderson vagrancy ordinance,[1] and in the search incident to the arrest discovered a .38-caliber revolver with six expended cartridges in the cylinder.

Powell was extradited to California and convicted of

---

[1] The ordinance provides:

"Every person is a vagrant who:

"[1] Loiters or wanders upon the streets or from place to place without apparent reason or business and [2] who refuses to identify himself and to account for his presence when asked by a police officer to do so [3] if surrounding circumstances are such as to indicate to a reasonable man that the public safety demands such identification."

second-degree murder in the Superior Court of San Bernardino County. Parsons and Powell's accomplices at the liquor store testified against him. A criminologist testified that the revolver found on Powell was the gun that killed Parsons' wife. The trial court rejected Powell's contention that testimony by the Henderson police officer as to the search and the discovery of the revolver should have been excluded because the vagrancy ordinance was unconstitutional. In October 1969, the conviction was affirmed by a California District Court of Appeal. Although the issue was duly presented, that court found it unnecessary to pass upon the legality of the arrest and search because it concluded that the error, if any, in admitting the testimony of the Henderson officer was harmless beyond a reasonable doubt under *Chapman* v. *California,* 386 U. S. 18 (1967). The Supreme Court of California denied Powell's petition for habeas corpus relief.

In August 1971 Powell filed an amended petition for a writ of federal habeas corpus under 28 U. S. C. § 2254 in the United States District Court for the Northern District of California, contending that the testimony concerning the .38-caliber revolver should have been excluded as the fruit of an illegal search. He argued that his arrest had been unlawful because the Henderson vagrancy ordinance was unconstitutionally vague, and that the arresting officer lacked probable cause to believe that he was violating it. The District Court concluded that the arresting officer had probable cause and held that even if the vagrancy ordinance was unconstitutional, the deterrent purpose of the exclusionary rule does not require that it be applied to bar admission of the fruits of a search incident to an otherwise valid arrest. In the alternative, that court agreed with the California District Court of Appeal that the admission of the evidence con-

cerning Powell's arrest, if error, was harmless beyond a reasonable doubt.

In December 1974, the Court of Appeals for the Ninth Circuit reversed. 507 F. 2d 93. The court concluded that the vagrancy ordinance was unconstitutionally vague,[2] that Powell's arrest was therefore illegal, and that although exclusion of the evidence would serve no deterrent purpose with regard to police officers who were enforcing statutes in good faith, exclusion would serve the public interest by deterring legislators from enacting unconstitutional statutes. *Id.*, at 98. After an independent review of the evidence the court concluded that the admission of the evidence was not harmless error since it supported the testimony of Parsons and Powell's accomplices. *Id.*, at 99.

## B

Respondent David Rice was convicted of murder in April 1971 after trial in a Nebraska state court. At 2:05 a. m. on August 17, 1970, Omaha police received a telephone call that a woman had been heard screaming at 2867 Ohio Street. As one of the officers sent to that address examined a suitcase lying in the doorway, it exploded, killing him instantly. By August 22 the investigation of the murder centered on Duane Peak, a 15-year-old member of the National Committee to Com-

---

[2] In support of the vagueness holding the court relied principally on *Papachristou* v. *Jacksonville,* 405 U. S. 156 (1972), where we invalidated a city ordinance in part defining vagrants as "persons wandering or strolling around from place to place without any lawful purpose or object . . . ." *Id.*, at 156–157, n. 1. Noting the similarity between the first element of the Henderson ordinance, see n. 1, *supra,* and the Jacksonville ordinance, it concluded that the second and third elements of the Henderson ordinance were not sufficiently specific to cure its overall vagueness. 507 F. 2d, at 95–97. Petitioner Stone challenges these conclusions, but in view of our disposition of the case we need not consider this issue.

bat Fascism (NCCF), and that afternoon a warrant was issued for Peak's arrest. The investigation also focused on other known members of the NCCF, including Rice, some of whom were believed to be planning to kill Peak before he could incriminate them. In their search for Peak, the police went to Rice's home at 10:30 that night and found lights and a television on, but there was no response to their repeated knocking. While some officers remained to watch the premises, a warrant was obtained to search for explosives and illegal weapons believed to be in Rice's possession. Peak was not in the house, but upon entering the police discovered, in plain view, dynamite, blasting caps, and other materials useful in the construction of explosive devices. Peak subsequently was arrested, and on August 27, Rice voluntarily surrendered. The clothes Rice was wearing at that time were subjected to chemical analysis, disclosing dynamite particles.

Rice was tried for first-degree murder in the District Court of Douglas County. At trial Peak admitted planting the suitcase and making the telephone call, and implicated Rice in the bombing plot. As corroborative evidence the State introduced items seized during the search, as well as the results of the chemical analysis of Rice's clothing. The court denied Rice's motion to suppress this evidence. On appeal the Supreme Court of Nebraska affirmed the conviction, holding that the search of Rice's home had been pursuant to a valid search warrant. *State* v. *Rice,* 188 Neb. 728, 199 N. W. 2d 480 (1972).

In September 1972 Rice filed a petition for a writ of habeas corpus in the United States District Court for Nebraska. Rice's sole contention was that his incarceration was unlawful because the evidence underlying his conviction had been discovered as the result of an illegal

search of his home. The District Court concluded that the search warrant was invalid, as the supporting affidavit was defective under *Spinelli* v. *United States,* 393 U. S. 410 (1969), and *Aguilar* v. *Texas,* 378 U. S. 108 (1964). 388 F. Supp. 185, 190–194 (1974).[3] The court also rejected the State's contention that even if the warrant was invalid the search was justified because of the valid arrest warrant for Peak and because of the exigent circumstances of the situation—danger to Peak and search for bombs and explosives believed in possession of the NCCF. The court reasoned that the arrest warrant did not justify the entry as the police lacked probable cause to believe Peak was in the house, and further concluded that the circumstances were not sufficiently exigent to justify an immediate warrantless

---

[3] The sole evidence presented to the magistrate was the affidavit in support of the warrant application. It indicated that the police believed explosives and illegal weapons were present in Rice's home because (1) Rice was an official of the NCCF, (2) a violent killing of an officer had occurred and it appeared that the NCCF was involved, and (3) police had received information in the past that Rice possessed weapons and explosives, which he had said should be used against the police. See 388 F. Supp., at 189 n. 1. In concluding that there existed probable cause for issuance of the warrant, although the Nebraska Supreme Court found the affidavit alone sufficient, it also referred to information contained in testimony adduced at the suppression hearing but not included in the affidavit. 188 Neb. 728, 738–739, 199 N. W. 2d 480, 487–488. See also *id.,* at 754, 199 N. W. 2d, at 495 (concurring opinion). The District Court limited its probable-cause inquiry to the face of the affidavit, see *Spinelli* v. *United States,* 393 U. S., at 413 n. 3; *Aguilar* v. *Texas,* 378 U. S., at 109 n. 1, and concluded probable cause was lacking. Petitioner Wolff contends that police should be permitted to supplement the information contained in an affidavit for a search warrant at the hearing on a motion to suppress, a contention that we have several times rejected, see, *e. g., Whiteley* v. *Warden,* 401 U. S. 560, 565 n. 8 (1971); *Aguilar* v. *Texas, supra,* at 109 n. 1, and need not reach again here.

search. *Id.,* at 194–202.[4] The Court of Appeals for the Eighth Circuit affirmed, substantially for the reasons stated by the District Court. 513 F. 2d 1280 (1975).

Petitioners Stone and Wolff, the wardens of the respective state prisons where Powell and Rice are incarcerated, petitioned for review of these decisions, raising questions concerning the scope of federal habeas corpus and the role of the exclusionary rule upon collateral review of cases involving Fourth Amendment claims. We granted their petitions for certiorari. 422 U. S. 1055 (1975).[5] We now reverse.

## II

The authority of federal courts to issue the writ of habeas corpus *ad subjiciendum* [6] was included in the first

---

[4] The District Court further held that the evidence of dynamite particles found on Rice's clothing should have been suppressed as the tainted fruit of an arrest warrant that would not have been issued but for the unlawful search of his home. 388 F. Supp., at 202–207. See *Wong Sun* v. *United States,* 371 U. S. 471 (1963); *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920).

[5] In the orders granting certiorari in these cases we requested that counsel in *Stone* v. *Powell* and *Wolff* v. *Rice* respectively address the questions:

"Whether, in light of the fact that the District Court found that the Henderson, Nev., police officer had probable cause to arrest respondent for violation of an ordinance which at the time of the arrest had not been authoritatively determined to be unconstitutional, respondent's claim that the gun discovered as a result of a search incident to that arrest violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution is one cognizable under 28 U. S. C. § 2254.

"Whether the constitutional validity of the entry and search of respondent's premises by Omaha police officers under the circumstances of this case is a question properly cognizable under 28 U. S. C. § 2254."

[6] It is now well established that the phrase "habeas corpus" used alone refers to the common-law writ of habeas corpus *ad subjicien-*

grant of federal-court jurisdiction, made by the Judiciary Act of 1789, c. 20, § 14, 1 Stat. 81, with the limitation that the writ extend only to prisoners held in custody by the United States. The original statutory authorization did not define the substantive reach of the writ. It merely stated that the courts of the United States "shall have power to issue writs of . . . *habeas corpus* . . . ." *Ibid.* The courts defined the scope of the writ in accordance with the common law and limited it to an inquiry as to the jurisdiction of the sentencing tribunal. See, *e. g., Ex parte Watkins,* 3 Pet. 193 (1830) (Marshall, C. J.).

In 1867 the writ was extended to state prisoners. Act of Feb. 5, 1867, c. 28, § 1, 14 Stat. 385. Under the 1867 Act federal courts were authorized to give relief in "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States . . . ." But the limitation of federal habeas corpus jurisdiction to consideration of the jurisdiction of the sentencing court persisted. See; *e. g., In re Wood,* 140 U. S. 278 (1891); *In re Rahrer,* 140 U. S. 545 (1891); *Andrews* v. *Swartz,* 156 U. S. 272 (1895); *Bergemann* v. *Backer,* 157 U. S. 655 (1895); *Pettibone* v. *Nichols,* 203 U. S. 192 (1906). And, although the concept of "jurisdiction" was subjected to considerable strain as the substantive scope of the writ was expanded,[7] this

---

*dum,* known as the "Great Writ." *Ex parte Bollman,* 4 Cranch 75, 95 (1807) (Marshall, C. J.).

[7] Prior to 1889 there was, in practical effect, no appellate review in federal criminal cases. The possibility of Supreme Court review on certificate of division of opinion in the circuit court was remote because of the practice of single district judges' holding circuit court. See P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 1539–1540 (2d ed. 1973); F. Frankfurter & J. Landis, The Business of the Supreme Court 31–32, 79–80, and n. 107 (1927). Pressure naturally developed for expansion of the scope of habeas corpus to reach otherwise

expansion was limited to only a few classes of cases [8] until *Frank* v. *Mangum*, 237 U. S. 309, in 1915. In *Frank*, the prisoner had claimed in the state courts that the proceedings which resulted in his conviction for murder had been dominated by a mob. After the State Supreme Court rejected his contentions, Frank unsuccessfully sought habeas corpus relief in the Federal District Court. This Court affirmed the denial of relief because Frank's federal claims had been considered by a competent and unbiased state tribunal. The Court recognized, however, that if a habeas corpus court found that the State had failed to provide adequate "corrective process" for the full and fair litigation of federal claims, whether or not "jurisdictional," the court could inquire into the merits to determine whether a detention was lawful. *Id.*, at 333–336.

In the landmark decision in *Brown* v. *Allen*, 344 U. S. 443, 482–487 (1953), the scope of the writ was expanded still further.[9] In that case and its companion case, *Daniels* v. *Allen*, state prisoners applied for federal habeas corpus relief claiming that the trial courts had erred

---

unreviewable decisions involving fundamental rights. See *Ex parte Siebold*, 100 U. S. 371, 376–377 (1880); Bator, Finality in Criminal Law and Federal Habeas Corpus For State Prisoners, 76 Harv. L. Rev. 441, 473, and n. 75 (1963).

[8] The expansion occurred primarily with regard to (i) convictions based on assertedly unconstitutional statutes, *e. g., Ex parte Siebold, supra,* or (ii) detentions based upon an allegedly illegal sentence, *e. g., Ex parte Lange*, 18 Wall. 163 (1874). See Bator, *supra,* n. 7, at 465–474.

[9] There has been disagreement among scholars as to whether the result in *Brown* v. *Allen* was foreshadowed by the Court's decision in *Moore* v. *Dempsey*, 261 U. S. 86 (1923). Compare Hart, Foreword: The Time Chart of the Justices, 73 Harv. L. Rev. 84, 105 (1959); Reitz, Federal Habeas Corpus; Impact of an Abortive State Proceeding, 74 Harv. L. Rev. 1315, 1328–1329 (1961), with Bator, *supra,* n. 7, at 488–491. See also *Fay* v. *Noia*, 372 U. S. 391, 421, and n. 30 (1963); *id.,* at 457–460 (Harlan, J., dissenting).

in failing to quash their indictments due to alleged discrimination in the selection of grand jurors and in ruling certain confessions admissible. In *Brown,* the highest court of the State had rejected these claims on direct appeal, *State* v. *Brown,* 233 N. C. 202, 63 S. E. 2d 99, and this Court had denied certiorari, 341 U. S. 943 (1951). Despite the apparent adequacy of the state corrective process, the Court reviewed the denial of the writ of habeas corpus and held that Brown was entitled to a full reconsideration of these constitutional claims, including, if appropriate, a hearing in the Federal District Court. In *Daniels,* however, the State Supreme Court on direct review had refused to consider the appeal because the papers were filed out of time. This Court held that since the state-court judgment rested on a reasonable application of the State's legitimate procedural rules, a ground that would have barred direct review of his federal claims by this Court, the District Court lacked authority to grant habeas corpus relief. See 344 U. S., at 458, 486.

This final barrier to broad collateral re-examination of state criminal convictions in federal habeas corpus proceedings was removed in *Fay* v. *Noia,* 372 U. S. 391 (1963).[10] Noia and two codefendants had been convicted

---

[10] Despite the expansion of the scope of the writ, there has been no change in the established rule with respect to nonconstitutional claims. The writ of habeas corpus and its federal counterpart, 28 U. S. C. § 2255, "will not be allowed to do service for an appeal." *Sunal* v. *Large,* 332 U. S. 174, 178 (1947). For this reason, nonconstitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings. *Id.,* at 178–179; *Davis* v. *United States,* 417 U. S. 333, 345–346, and n. 15 (1974). Even those nonconstitutional claims that could not have been asserted on direct appeal can be raised on collateral review only if the alleged error constituted " 'a fundamental defect which inherently results in a complete miscarriage of justice,' " *id.,* at 346, quoting *Hill* v. *United States,* 368 U. S. 424, 428 (1962).

of felony murder. The sole evidence against each defendant was a signed confession. Noia's codefendants, but not Noia himself, appealed their convictions. Although their appeals were unsuccessful, in subsequent state proceedings they were able to establish that their confessions had been coerced and their convictions therefore procured in violation of the Constitution. In a subsequent federal habeas corpus proceeding, it was stipulated that Noia's confession also had been coerced, but the District Court followed *Daniels* in holding that Noia's failure to appeal barred habeas corpus review. See *United States* v. *Fay,* 183 F. Supp. 222, 225 (SDNY 1960). The Court of Appeals reversed, ordering that Noia's conviction be set aside and that he be released from custody or that a new trial be granted. This Court affirmed the grant of the writ, narrowly restricting the circumstances in which a federal court may refuse to consider the merits of federal constitutional claims.[11]

During the period in which the substantive scope of the writ was expanded, the Court did not consider whether exceptions to full review might exist with respect

---

[11] In construing broadly the power of a federal district court to consider constitutional claims presented in a petition for writ of habeas corpus, the Court in *Fay* also reaffirmed the equitable nature of the writ, noting that "[d]iscretion is implicit in the statutory command that the judge . . . 'dispose of the matter as law and justice require.' 28 U. S. C. § 2243." 372 U. S., at 438. More recently, in *Francis* v. *Henderson,* 425 U. S. 536 (1976), holding that a state prisoner who failed to make a timely challenge to the composition of the grand jury that indicted him cannot bring such a challenge in a postconviction federal habeas corpus proceeding absent a claim of actual prejudice, we emphasized:

"This Court has long recognized that in some circumstances considerations of comity and concerns for the orderly administration of criminal justice require a federal court to forgo the exercise of its habeas corpus power. See *Fay* v. *Noia,* 372 U. S. 391, 425–426." *Id.,* at 539.

to particular categories of constitutional claims. Prior to the Court's decision in *Kaufman* v. *United States,* 394 U. S. 217 (1969), however, a substantial majority of the Federal Courts of Appeals had concluded that collateral review of search-and-seizure claims was inappropriate on motions filed by federal prisoners under 28 U. S. C. § 2255, the modern postconviction procedure available to federal prisoners in lieu of habeas corpus.[12] The primary rationale advanced in support of those decisions was that Fourth Amendment violations are different in kind from denials of Fifth or Sixth Amendment rights in that claims of illegal search and seizure do not "impugn the integrity of the fact-finding process or challenge evidence as inherently unreliable; rather, the exclusion of illegally seized evidence is simply a prophylactic device intended generally to deter Fourth Amendment violations by law enforcement officers." 394 U. S., at 224. See *Thornton* v. *United States,* 125 U. S. App. D. C. 114, 368 F. 2d 822 (1966).

*Kaufman* rejected this rationale and held that search-and-seizure claims are cognizable in § 2255 proceedings. The Court noted that "the federal habeas remedy extends to state prisoners alleging that unconstitutionally obtained evidence was admitted against them at trial," 394 U. S., at 225, citing, *e. g., Mancusi* v. *DeForte,* 392

---

[12] Compare, *e. g., United States* v. *Re,* 372 F. 2d 641 (CA2), cert. denied, 388 U. S. 912 (1967); *United States* v. *Jenkins,* 281 F. 2d 193 (CA3 1960); *Eisner* v. *United States,* 351 F. 2d 55 (CA6 1965); *De Welles* v. *United States,* 372 F. 2d 67 (CA7), cert denied, 388 U. S. 919 (1967); *Williams* v. *United States,* 307 F. 2d 366 (CA9 1962); *Armstead* v. *United States,* 318 F. 2d 725 (CA5 1963), with, *e. g., United States* v. *Sutton,* 321 F. 2d 221 (CA4 1963); *Gaitan* v. *United States,* 317 F. 2d 494 (CA10 1963). See also *Thornton* v. *United States,* 125 U. S. App. D. C. 114, 368 F. 2d 822 (1966) (search-and-seizure claims not cognizable under § 2255 absent special circumstances).

U. S. 364 (1968); *Carafas* v. *LaVallee,* 391 U. S. 234 (1968), and concluded, as a matter of statutory construction, that there was no basis for restricting "access by federal prisoners with illegal search-and-seizure claims to federal collateral remedies, while placing no similar restriction on access by state prisoners," 394 U. S., at 226. Although in recent years the view has been expressed that the Court should re-examine the substantive scope of federal habeas jurisdiction and limit collateral review of search-and-seizure claims "solely to the question of whether the petitioner was provided a fair opportunity to raise and have adjudicated the question in state courts," *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 250 (1973) (POWELL, J., concurring),[13] the Court, without discussion or consideration of the issue, has continued to accept jurisdiction in cases raising such claims. See *Lefkowitz* v. *Newsome,* 420 U. S. 283 (1975); *Cady* v. *Dombrowski,* 413 U. S. 433 (1973); *Cardwell* v. *Lewis,* 417 U. S. 583 (1974) (plurality opinion).[14]

The discussion in *Kaufman* of the scope of federal habeas corpus rests on the view that the effectuation of the Fourth Amendment, as applied to the States through the Fourteenth Amendment, requires the granting of habeas corpus relief when a prisoner has been con-

---

[13] See, *e. g.,* Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142 (1970).

[14] In *Newsome* the Court focused on the issue whether a state defendant's plea of guilty waives federal habeas corpus review where state law does not foreclose review of the plea on direct appeal, and did not consider the substantive scope of the writ. See 420 U. S., at 287 n. 4. Similarly, in *Cardwell* and *Cady* the question considered here was not presented in the petition for certiorari, and in neither case was relief granted on the basis of a search-and-seizure claim. In *Cardwell* the plurality expressly noted that it was not addressing the issue of the substantive scope of the writ. See 417 U. S., at 596, and n. 12.

victed in state court on the basis of evidence obtained in an illegal search or seizure since those Amendments were held in *Mapp* v. *Ohio,* 367 U. S. 643 (1961), to require exclusion of such evidence at trial and reversal of conviction upon direct review.[15]  Until these cases we have not had occasion fully to consider the validity of this view. See, *e. g., Schneckloth* v. *Bustamonte, supra,* at 249 n. 38; *Cardwell* v. *Lewis, supra,* at 596, and n. 12.  Upon examination, we conclude, in light of the nature and purpose of the Fourth Amendment exclusionary rule, that this view is unjustified.[16]  We hold, therefore, that

---

[15] As Mr. Justice Black commented in dissent, 394 U. S., at 231, 239, the *Kaufman* majority made no effort to justify its result in light of the long-recognized deterrent purpose of the exclusionary rule.  Instead, the Court relied on a series of prior cases as implicitly establishing the proposition that search-and-seizure claims are cognizable in federal habeas corpus proceedings.  See *Mancusi* v. *DeForte,* 392 U. S. 364 (1968); *Carafas* v. *LaVallee,* 391 U. S. 234 (1968); *Warden* v. *Hayden,* 387 U. S. 294 (1967).  But only in *Mancusi* did this Court order habeas relief on the basis of a search-and-seizure claim, and in that case, as well as in *Warden,* the issue of the substantive scope of the writ was not presented to the Court in the petition for writ of certiorari.  Moreover, of the other "numerous occasions" cited by MR. JUSTICE BRENNAN's dissent, *post,* at 518–519, in which the Court has accepted jurisdiction over collateral attacks by state prisoners raising Fourth Amendment claims, in only one case—*Whiteley* v. *Warden,* 401 U. S. 560 (1971)— was relief granted on that basis.  And in *Whiteley,* as in *Mancusi,* the issue of the substantive scope of the writ was not presented in the petition for certiorari.  As emphasized by Mr. Justice Black, only in the most exceptional cases will we consider issues not raised in the petition.  394 U. S., at 239, and n. 7.

[16] The issue in *Kaufman* was the scope of § 2255.  Our decision today rejects the dictum in *Kaufman* concerning the applicability of the exclusionary rule in federal habeas corpus review of state-court decisions pursuant to § 2254.  To the extent the application of the exclusionary rule in *Kaufman* did not rely upon the supervisory role of this Court over the lower federal courts, cf. *Elkins* v.

where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.[17]

### III

The Fourth Amendment assures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Amendment was primarily a reaction to the evils associated with the use of the general warrant in England and the writs of assistance in the Colonies, *Stanford* v. *Texas,* 379 U. S. 476, 481–485 (1965); *Frank* v. *Maryland,* 359 U. S. 360, 363–365 (1959), and was intended to protect the "sanctity of a man's home and the privacies of life," *Boyd* v. *United States,* 116 U. S. 616, 630 (1886), from searches under unchecked general authority.[18]

The exclusionary rule was a judicially created means of effectuating the rights secured by the Fourth Amendment. Prior to the Court's decisions in *Weeks* v. *United States,* 232 U. S. 383 (1914), and *Gouled* v. *United States,* 255 U. S. 298 (1921), there existed no barrier to the introduction in criminal trials of evidence obtained in violation of the Amendment. See *Adams* v. *New York,*

---

*United States,* 364 U. S. 206 (1960), see *infra,* at 484, the rationale for its application in that context is also rejected.

[17] We find it unnecessary to consider the other issues concerning the exclusionary rule, or the statutory scope of the habeas corpus statute, raised by the parties. These include, principally, whether in view of the purpose of the rule, it should be applied on a *per se* basis without regard to the nature of the constitutional claim or the circumstances of the police action.

[18] See generally J. Landynski, Search and Seizure and the Supreme Court (1966); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution (1937).

192 U. S. 585 (1904).[19] In *Weeks* the Court held that the defendant could petition before trial for the return of property secured through an illegal search or seizure conducted by federal authorities. In *Gouled* the Court held broadly that such evidence could not be introduced in a federal prosecution. See *Warden* v. *Hayden,* 387 U. S. 294, 304–305 (1967). See also *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920) (fruits of illegally seized evidence). Thirty-five years after *Weeks* the Court held in *Wolf* v. *Colorado,* 338 U. S. 25 (1949), that the right to be free from arbitrary intrusion by the police that is protected by the Fourth Amendment is "implicit in 'the concept of ordered liberty' and as such enforceable against the States through the [Fourteenth Amendment] Due Process Clause." *Id.,* at 27–28. The Court concluded, however, that the *Weeks* exclusionary rule would not be imposed upon the States as "an essential ingredient of [that] right." 338 U. S., at 29. The full force of *Wolf* was eroded in subsequent decisions, see *Elkins* v. *United States,* 364 U. S. 206 (1960); *Rea* v. *United States,* 350 U. S. 214 (1956), and a little more than a decade later the exclusionary rule was held applicable to the States in *Mapp* v. *Ohio,* 367 U. S. 643 (1961).

---

[19] The roots of the *Weeks* decision lay in an early decision, *Boyd* v. *United States,* 116 U. S. 616 (1886), where the Court held that the compulsory production of a person's private books and papers for introduction against him at trial violated the Fourth and Fifth Amendments. *Boyd,* however, had been severely limited in *Adams* v. *New York,* where the Court, emphasizing that the "law held unconstitutional [in *Boyd*] virtually compelled the defendant to furnish testimony against himself," 192 U. S., at 598, adhered to the common-law rule that a trial court must not inquire, on Fourth Amendment grounds, into the method by which otherwise competent evidence was acquired. See, *e. g., Commonwealth* v. *Dana,* 43 Mass. 329 (1841).

Decisions prior to *Mapp* advanced two principal reasons for application of the rule in federal trials. The Court in *Elkins,* for example, in the context of its special supervisory role over the lower federal courts, referred to the "imperative of judicial integrity," suggesting that exclusion of illegally seized evidence prevents contamination of the judicial process. 364 U. S., at 222.[20] But even in that context a more pragmatic ground was emphasized:

> "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Id.,* at 217.

The *Mapp* majority justified the application of the rule to the States on several grounds,[21] but relied principally upon the belief that exclusion would deter future unlawful police conduct. 367 U. S., at 658.

---

[20] See *Terry* v. *Ohio,* 392 U. S. 1, 12–13 (1968); *Weeks* v. *United States,* 232 U. S. 383, 391–392, 394 (1914); *Olmstead* v. *United States,* 277 U. S. 438, 470 (1928) (Holmes, J., dissenting); *id.,* at 484 (Brandeis, J., dissenting).

[21] See 367 U. S., at 656 (prevention of introduction of evidence where introduction is "tantamount" to a coerced confession); *id.,* at 658 (deterrence of Fourth Amendment violations); *id.,* at 659 (preservation of judicial integrity).

Only four Justices adopted the view that the Fourth Amendment itself requires the exclusion of unconstitutionally seized evidence in state criminal trials. See *id.,* at 656; *id.,* at 666 (Douglas, J., concurring). Mr. Justice Black adhered to his view that the Fourth Amendment, standing alone, was not sufficient, see *Wolf* v. *Colorado,* 338 U. S. 25, 39 (1949) (concurring opinion), but concluded that, when the Fourth Amendment is considered in conjunction with the Fifth Amendment ban against compelled self-incrimination, a constitutional basis emerges for requiring exclusion. 367 U. S., at 661 (concurring opinion). See n. 19, *supra.*

Although our decisions often have alluded to the "imperative of judicial integrity," *e. g., United States* v. *Peltier,* 422 U. S. 531, 536–539 (1975), they demonstrate the limited role of this justification in the determination whether to apply the rule in a particular context.[22] Logically extended this justification would require that courts exclude unconstitutionally seized evidence despite lack of objection by the defendant, or even over his assent. Cf. *Henry* v. *Mississippi,* 379 U. S. 443 (1965). It also would require abandonment of the standing limitations on who may object to the introduction of unconstitutionally seized evidence, *Alderman* v. *United States,* 394 U. S. 165 (1969), and retreat from the proposition that judicial proceedings need not abate when the defendant's person is unconstitutionally seized, *Gerstein* v. *Pugh,* 420 U. S. 103, 119 (1975); *Frisbie* v. *Collins,* 342 U. S. 519 (1952). Similarly, the interest in promoting judicial integrity does not prevent the use of illegally seized evidence in grand jury proceedings. *United States* v. *Calandra,* 414 U. S. 338 (1974). Nor does it require that the trial court exclude such evidence from use for impeachment of a defendant, even though its introduction is certain to result in conviction in some cases. *Walder* v. *United States,* 347 U. S. 62 (1954). The teaching of these cases is clear. While courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence.[23]

---

[22] See Monaghan, Foreword: Constitutional Common Law, 89 Harv. L. Rev. 1, 5–6, and n. 33 (1975).

[23] As we recognized last Term, judicial integrity is "not offended if law enforcement officials reasonably believed in good faith that their conduct was in accordance with the law even if decisions subsequent to the search and seizure have held that conduct of the type engaged in by the law enforcement officials is not permitted by the

The force of this justification becomes minimal where federal habeas corpus relief is sought by a prisoner who previously has been afforded the opportunity for full and fair consideration of his search-and-seizure claim at trial and on direct review.

The primary justification for the exclusionary rule then is the deterrence of police conduct that violates Fourth Amendment rights. Post-*Mapp* decisions have established that the rule is not a personal constitutional right. It is not calculated to redress the injury to the privacy of the victim of the search or seizure, for any "[r]eparation comes too late." *Linkletter* v. *Walker,* 381 U. S. 618, 637 (1965). Instead,

> "the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect . . . ." *United States* v. *Calandra, supra,* at 348.

Accord, *United States* v. *Peltier, supra,* at 538–539; *Terry* v. *Ohio,* 392 U. S. 1, 28–29 (1968); *Linkletter* v. *Walker, supra,* at 636–637; *Tehan* v. *United States ex rel. Shott,* 382 U. S. 406, 416 (1966).

*Mapp* involved the enforcement of the exclusionary rule at state trials and on direct review. The decision in *Kaufman,* as noted above, is premised on the view that implementation of the Fourth Amendment also requires the consideration of search-and-seizure claims upon collateral review of state convictions. But despite the broad deterrent purpose of the exclusionary rule, it has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons. As in the case of any remedial device, "the application of the rule has been restricted to those areas where its reme-

---

Constitution." *United States* v. *Peltier,* 422 U. S. 531, 538 (1975) (emphasis omitted).

dial objectives are thought most efficaciously served." *United States* v. *Calandra, supra,* at 348.[24]  Thus, our refusal to extend the exclusionary rule to grand jury proceedings was based on a balancing of the potential injury to the historic role and function of the grand jury by such extension against the potential contribution to the effectuation of the Fourth Amendment through deterrence of police misconduct:

> "Any incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best.  Whatever deterrence of police misconduct may result from the exclusion of illegally seized evidence from criminal trials, it is unrealistic to assume that application of the rule to grand jury proceedings would significantly further that goal.  Such an extension would deter only police investigation consciously directed toward the discovery of evidence solely for use in a grand jury investigation. . . .  We therefore decline to embrace a view that would achieve a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially

---

[24] As Professor Amsterdam has observed:

"The rule is unsupportable as reparation or compensatory dispensation to the injured criminal; its sole rational justification is the experience of its indispensability in 'exert[ing] general legal pressures to secure obedience to the Fourth Amendment on the part of . . . law-enforcing officers.'  As it serves this function, the rule is a needed, but grud[g]ingly taken, medicament; no more should be swallowed than is needed to combat the disease.  Granted that so many criminals must go free as will deter the constables from blundering, pursuance of this policy of liberation beyond the confines of necessity inflicts gratuitous harm on the public interest . . . ."  Search, Seizure, and Section 2255: A Comment, 112 U. Pa. L. Rev. 378, 388–389 (1964) (footnotes omitted).

impeding the role of the grand jury." 414 U. S., at 351–352 (footnote omitted).

The same pragmatic analysis of the exclusionary rule's usefulness in a particular context was evident earlier in *Walder* v. *United States, supra,* where the Court permitted the Government to use unlawfully seized evidence to impeach the credibility of a defendant who had testified broadly in his own defense. The Court held, in effect, that the interests safeguarded by the exclusionary rule in that context were outweighed by the need to prevent perjury and to assure the integrity of the trial process. The judgment in *Walder* revealed most clearly that the policies behind the exclusionary rule are not absolute. Rather, they must be evaluated in light of competing policies. In that case, the public interest in determination of truth at trial [25] was deemed to outweigh the incremental contribution that might have been made to the protection of Fourth Amendment values by application of the rule.

The balancing process at work in these cases also finds expression in the standing requirement. Standing to invoke the exclusionary rule has been found to exist only when the Government attempts to use illegally obtained evidence to incriminate the victim of the illegal search. *Brown* v. *United States,* 411 U. S. 223 (1973); *Alderman* v. *United States,* 394 U. S. 165 (1969); *Wong Sun* v. *United States,* 371 U. S. 471, 491–492 (1963). See *Jones* v. *United States,* 362 U. S. 257, 261 (1960). The standing requirement is premised on the view that the "additional benefits of extending the . . . rule" to defendants other than the victim of the search or seizure are outweighed by the "further encroachment upon the

---

[25] See generally M. Frankel, The Search For Truth—An Umpireal View, 31st Annual Benjamin N. Cardozo Lecture, Association of the Bar of the City of New York, Dec. 16, 1974.

public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Alderman* v. *United States, supra,* at 174–175.[26]

## IV

We turn now to the specific question presented by these cases. Respondents allege violations of Fourth Amendment rights guaranteed them through the Fourteenth Amendment. The question is whether state prisoners— who have been afforded the opportunity for full and fair consideration of their reliance upon the exclusionary rule with respect to seized evidence by the state courts at trial and on direct review—may invoke their claim again on federal habeas corpus review. The answer is to be found by weighing the utility of the exclusionary rule against the costs of extending it to collateral review of Fourth Amendment claims.

The costs of applying the exclusionary rule even at trial and on direct review are well known: [27] the focus

---

[26] Cases addressing the question whether search-and-seizure holdings should be applied retroactively also have focused on the deterrent purpose served by the exclusionary rule, consistently with the balancing analysis applied generally in the exclusionary rule context. See *Desist* v. *United States,* 394 U. S. 244, 249–251, 253–254, and n. 21 (1969); *Linkletter* v. *Walker,* 381 U. S. 618, 636–637 (1965). Cf. *Fuller* v. *Alaska,* 393 U. S. 80, 81 (1968). The "attenuation-of-the-taint" doctrine also is consistent with the balancing approach. See *Brown* v. *Illinois,* 422 U. S. 590 (1975); *Wong Sun* v. *United States,* 371 U. S., at 491–492; Amsterdam, *supra,* n. 24, at 389–390.

[27] See, *e. g., Irvine* v. *California,* 347 U. S. 128, 136 (1954); *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, 411 (1971) (BURGER, C. J., dissenting); *People* v. *Defore,* 242 N. Y. 13, 150 N. E. 585 (1926) (Cardozo, J.); 8 J. Wigmore, Evidence § 2184a, pp. 51–52 (McNaughton ed. 1961); Amsterdam, *supra,* n. 24, at 388–391; Friendly, *supra,* n. 13, at 161; Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 736–754 (1970), and

of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding.[28] Moreover, the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant. As Mr. Justice Black emphasized in his dissent in *Kaufman:*

> "A claim of illegal search and seizure under the Fourth Amendment is crucially different from many other constitutional rights; ordinarily the evidence seized can in no way have been rendered untrustworthy by the means of its seizure and indeed often this evidence alone establishes beyond virtually any shadow of a doubt that the defendant is guilty." 394 U. S., at 237.

Application of the rule thus deflects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice.[29] Thus,

---

sources cited therein; Paulsen, The Exclusionary Rule and Misconduct by the Police, 52 J. Crim. L. C. & P. S. 255, 256 (1961); Wright, Must the Criminal Go Free If the Constable Blunders?, 50 Tex. L. Rev. 736 (1972).

[28] See address by Justice Schaefer of the Supreme Court of Illinois, Is the Adversary System Working in Optimal Fashion?, delivered at the National Conference on the Causes of Popular Dissatisfaction With the Administration of Justice, pp. 8–9, Apr. 8, 1976; cf. Frankel, *supra,* n. 25.

[29] Many of the proposals for modification of the scope of the exclusionary rule recognize at least implicitly the role of proportionality in the criminal justice system and the potential value of establishing a direct relationship between the nature of the violation and the decision whether to invoke the rule. See ALI, A

although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice.[30] These long-recognized costs of the rule persist when a criminal conviction is sought to be overturned on collateral review on the ground that a search-and-seizure claim was erroneously rejected by two or more tiers of state courts.[31]

---

Model Code of Pre-arraignment Procedure, § 290.2, pp. 181–183 (1975) ("substantial violations"); H. Friendly, Benchmarks 260–262 (1967) (even at trial, exclusion should be limited to "the fruit of activity intentionally or flagrantly illegal"); 8 Wigmore, *supra,* n. 27, at 52–53. See n. 17, *supra.*

[30] In a different context, Dallin H. Oaks has observed:

"I am criticizing, not our concern with procedures, but our preoccupation, in which we may lose sight of the fact that our procedures are not the ultimate goals of our legal system. Our goals are truth and justice, and procedures are but means to these ends. . . .

"Truth and justice are ultimate values, so understood by our people, and the law and the legal profession will not be worthy of public respect and loyalty if we allow our attention to be diverted from these goals." Ethics, Morality and Professional Responsibility, 1975 B. Y. U. L. Rev. 591, 596.

[31] Resort to habeas corpus, especially for purposes other than to assure that no innocent person suffers an unconstitutional loss of liberty, results in serious intrusions on values important to our system of government. They include "(i) the most effective utilization of limited judicial resources, (ii) the necessity of finality in criminal trials, (iii) the minimization of friction between our federal and state systems of justice, and (iv) the maintenance of the constitutional balance upon which the doctrine of federalism is founded." *Schneckloth* v. *Bustamonte,* 412 U. S., at 259 (POWELL, J., concurring). See also *Kaufman* v. *United States,* 394 U. S., at 231 (Black, J., dissenting); Friendly, *supra,* n. 13.

We nevertheless afford broad habeas corpus relief, recognizing the need in a free society for an additional safeguard against

Evidence obtained by police officers in violation of the Fourth Amendment is excluded at trial in the hope that the frequency of future violations will decrease. Despite the absence of supportive empirical evidence,[32] we have assumed that the immediate effect of exclusion will be to discourage law enforcement officials from violating the Fourth Amendment by removing the incentive to disregard it. More importantly, over the long term, this demonstration that our society attaches serious consequences to violation of constitutional rights is thought to encourage those who formulate law enforcement policies, and the officers who implement them, to incorporate Fourth Amendment ideals into their value system.[33]

---

compelling an innocent man to suffer an unconstitutional loss of liberty. The Court in *Fay* v. *Noia* described habeas corpus as a remedy for "whatever society deems to be intolerable restraints," and recognized that those to whom the writ should be granted "are persons whom society has grievously wronged." 372 U. S., at 401, 441. But in the case of a typical Fourth Amendment claim, asserted on collateral attack, a convicted defendant is usually asking society to redetermine an issue that has no bearing on the basic justice of his incarceration.

[32] The efficacy of the exclusionary rule has long been the subject of sharp debate. Until recently, scholarly empirical research was unavailable. *Elkins* v. *United States,* 364 U. S., at 218. And, the evidence derived from recent empirical research is still inconclusive. Compare, *e. g.,* Oaks, *supra,* n. 27; Spiotto, Search and Seizure: An Empirical Study of the Exclusionary Rule and Its Alternatives, 2 J. Legal Studies 243 (1973), with, *e. g.,* Canon, Is the Exclusionary Rule in Failing Health?, Some New Data and a Plea Against a Precipitous Conclusion, 62 Ky. L. J. 681 (1974). See *United States* v. *Janis, ante,* at 450–452, n. 22; Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 475 n. 593 (1974); Comment, On the Limitations of Empirical Evaluations of the Exclusionary Rule: A Critique of the Spiotto Research and United States v. Calandra, 69 Nw. U. L. Rev. 740 (1974).

[33] See Oaks, *supra,* n. 27, at 756.

We adhere to the view that these considerations support the implementation of the exclusionary rule at trial and its enforcement on direct appeal of state-court convictions. But the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs. To be sure, each case in which such claim is considered may add marginally to an awareness of the values protected by the Fourth Amendment. There is no reason to believe, however, that the overall educative effect of the exclusionary rule would be appreciably diminished if search-and-seizure claims could not be raised in federal habeas corpus review of state convictions.[34] Nor is there reason to assume that any specific disincentive already created by the risk of exclusion of evidence at trial or the reversal of convictions on direct review would be enhanced if there were the further risk that a conviction obtained in state court and affirmed on direct review might be overturned in collateral proceedings often occurring years after the incarceration of the defendant. The view that the deterrence of Fourth Amendment violations would be furthered rests on the dubious assumption that law enforcement authorities would fear that federal habeas review might reveal flaws in a search or seizure that went undetected at trial and on appeal.[35] Even if one rationally could assume that

[34] "As the exclusionary rule is applied time after time, it seems that its deterrent efficacy at some stage reaches a point of diminishing returns, and beyond that point its continued application is a public nuisance." Amsterdam, *supra,* n. 24, at 389.

[35] The policy arguments that respondents marshal in support of the view that federal habeas corpus review is necessary to effectuate the Fourth Amendment stem from a basic mistrust of the state courts as fair and competent forums for the adjudication of federal constitutional rights. The argument is that state courts cannot be trusted to effectuate Fourth Amendment values through

some additional incremental deterrent effect would be present in isolated cases, the resulting advance of the legitimate goal of furthering Fourth Amendment rights would be outweighed by the acknowledged costs to other values vital to a rational system of criminal justice.

In sum, we conclude that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim,[36] a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.[37]  In this context the

---

fair application of the rule, and the oversight jurisdiction of this Court on certiorari is an inadequate safeguard.  The principal rationale for this view emphasizes the broad differences in the respective institutional settings within which federal judges and state judges operate.  Despite differences in institutional environment and the unsympathetic attitude to federal constitutional claims of some state judges in years past, we are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States.  State courts, like federal courts, have a constitutional obligation to safeguard personal liberties and to uphold federal law.  *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 341–344 (1816).  Moreover, the argument that federal judges are more expert in applying federal constitutional law is especially unpersuasive in the context of search-and-seizure claims, since they are dealt with on a daily basis by trial level judges in both systems.  In sum, there is "no intrinsic reason why the fact that a man is a federal judge should make him more competent, or conscientious, or learned with respect to the [consideration of Fourth Amendment claims] than his neighbor in the state courthouse."  Bator, *supra,* n. 7, at 509.

[36] Cf. *Townsend* v. *Sain,* 372 U. S. 293 (1963).

[37] Mr. Justice Brennan's dissent characterizes the Court's opinion as laying the groundwork for a "drastic withdrawal of federal habeas jurisdiction, if not for all grounds . . . , then at least [for many] . . . ."  *Post,* at 517.  It refers variously to our opinion as a "novel reinterpretation of the habeas statutes," *post,* at 515; as a "harbinger of future eviscerations of the habeas statutes," *post,* at 516; as "rewrit[ing] Congress' jurisdictional statutes . . . and [bar-

contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal and the substantial societal costs of application of the rule persist with special force.[38]

---

ring] access to federal courts by state prisoners with constitutional claims distasteful to a majority" of the Court, *post,* at 522; and as a "denigration of constitutional guarantees [that] must appall citizens taught to expect judicial respect" of constitutional rights, *post,* at 523.

With all respect, the hyperbole of the dissenting opinion is misdirected. Our decision today is *not* concerned with the scope of the habeas corpus statute as authority for litigating constitutional claims generally. We do reaffirm that the exclusionary rule is a judicially created remedy rather than a personal constitutional right, see *supra,* at 486, and we emphasize the minimal utility of the rule when sought to be applied to Fourth Amendment claims in a habeas corpus proceeding. As Mr. Justice Black recognized in this context, "ordinarily the evidence seized can in no way have been rendered untrustworthy . . . and indeed often . . . alone establishes beyond virtually any shadow of a doubt that the defendant is guilty." *Kaufman* v. *United States,* 394 U. S., at 237 (dissenting opinion). In sum, we hold only that a federal court need not apply the exclusionary rule on habeas review of a Fourth Amendment claim absent a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim at trial and on direct review. Our decision does not mean that the federal court lacks jurisdiction over such a claim, but only that the application of the rule is limited to cases in which there has been both such a showing and a Fourth Amendment violation.

[38] See n. 31, *supra.* Respondents contend that since they filed petitions for federal habeas corpus rather than seeking direct review by this Court through an application for a writ of certiorari, and since the time to apply for certiorari has now passed, any diminution in their ability to obtain habeas corpus relief on the ground evidence obtained in an unconstitutional search or seizure was introduced at their trials should be prospective. Cf. *England* v. *Louisiana State Board of Medical Examiners,* 375 U. S. 411, 422–423 (1964). We reject these contentions. Although not required to do so under the Court's prior decisions, see *Fay* v. *Noia,* 372 U. S. 391 (1963), respondents were, of course, free to file a timely petition for certiorari prior to seeking federal habeas corpus relief.

Accordingly, the judgments of the Courts of Appeals are

*Reversed.*

MR. CHIEF JUSTICE BURGER, concurring.

I concur in the Court's opinion. By way of dictum, and somewhat hesitantly, the Court notes that the holding in this case leaves undisturbed the exclusionary rule as applied to criminal trials. For reasons stated in my dissent in *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, 411 (1971), it seems clear to me that the exclusionary rule has been operative long enough to demonstrate its flaws. The time has come to modify its reach, even if it is retained for a small and limited category of cases.

Over the years, the strains imposed by reality, in terms of the costs to society and the bizarre miscarriages of justice that have been experienced because of the exclusion of reliable evidence when the "constable blunders," have led the Court to vacillate as to the rationale for deliberate exclusion of truth from the factfinding process. The rhetoric has varied with the rationale to the point where the rule has become a doctrinaire result in search of validating reasons.

In evaluating the exclusionary rule, it is important to bear in mind exactly what the rule accomplishes. Its function is simple—the exclusion of truth from the factfinding process. Cf. M. Frankel, The Search for Truth— An Umpireal View, 31st Annual Benjamin N. Cardozo Lecture, Association of the Bar of the City of New York, Dec. 16, 1974. The operation of the rule is therefore unlike that of the Fifth Amendment's protection against compelled self-incrimination. A confession produced after intimidating or coercive interrogation is inherently dubious. If a suspect's will has been overborne, a cloud

hangs over his custodial admissions; the exclusion of such statements is based essentially on their lack of reliability. This is not the case as to *reliable* evidence—a pistol, a packet of heroin, counterfeit money, or the body of a murder victim—which may be judicially declared to be the result of an "unreasonable" search. The reliability of such evidence is beyond question; its probative value is certain.

This remarkable situation—one unknown to the common-law tradition—had its genesis in a case calling for the protection of private papers against governmental intrusions. *Boyd* v. *United States,* 116 U. S. 616 (1886). See also *Weeks* v. *United States,* 232 U. S. 383 (1914). In *Boyd,* the Court held that private papers were inadmissible because of the Government's violation of the Fourth and Fifth Amendments. In *Weeks,* the Court excluded private letters seized from the accused's home by a federal official acting without a warrant. In both cases, the Court had a clear vision of what it was seeking to protect. What the Court said in *Boyd* shows how far we have strayed from the original path:

> "The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, *are totally different things from a search for and seizure of a man's private books and papers* for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ *toto coelo.*" 116 U. S., at 623. (Emphasis added.)

In *Weeks,* the Court emphasized that the Government, under settled principles of common law, had no right to keep a person's *private papers.* The Court noted that the case did not involve "burglar's tools or other *proofs of guilt* . . . ." 232 U. S., at 392. (Emphasis added.)

From this origin, the exclusionary rule has been

changed in focus entirely. It is now used almost exclusively to exclude from evidence articles which are unlawful to be possessed or tools and instruments of crime. Unless it can be rationally thought that the Framers considered it essential to protect the liberties of the people to hold that which it is unlawful to possess, then it becomes clear that our constitutional course has taken a most bizarre tack.

The drastically changed nature of judicial concern—from the protection of personal papers or effects in one's private quarters, to the exclusion of that which the accused had no right to possess—is only one of the more recent anomalies of the rule. The original incongruity was the rule's inconsistency with the general proposition that "our legal system does not attempt to do justice incidentally and to enforce penalties by indirect means." 8 J. Wigmore, Evidence § 2181, p. 6 (McNaughten ed. 1961). The rule is based on the hope that events in the courtroom or appellate chambers, long after the crucial acts took place, will somehow modify the way in which policemen conduct themselves. A more clumsy, less direct means of imposing sanctions is difficult to imagine, particularly since the issue whether the policeman did indeed run afoul of the Fourth Amendment is often not resolved until years after the event. The "sanction" is particularly indirect when, as in No. 74–1222, the police go before a magistrate, who issues a warrant. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Imposing an admittedly indirect "sanction" on the police officer in that instance is nothing less than sophisticated nonsense.

Despite this anomaly, the exclusionary rule now rests upon its purported tendency to deter police misconduct, *United States* v. *Janis, ante,* p. 433; *United States* v.

*Calandra,* 414 U. S. 338, 347 (1974), although, as we know, the rule has long been applied to wholly good-faith mistakes and to purely technical deficiencies in warrants. Other rhetorical generalizations, \including the "imperative of judicial integrity," have not withstood analysis as more and more critical appraisals of the rule's operation have appeared. See, *e. g.,* Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665 (1970). Indeed, settled rules demonstrate that the "judicial integrity" rationalization is fatally flawed. First, the Court has refused to entertain claims that evidence was unlawfully seized unless the claimant could demonstrate that he had standing to press the contention. *Alderman* v. *United States,* 394 U. S. 165 (1969). If he could not, the evidence, albeit secured in violation of the Fourth Amendment, is admissible. Second, as one scholar has correctly observed:

> "[I]t is difficult to accept the proposition that the exclusion of improperly obtained evidence is necessary for 'judicial integrity' when no such rule is observed in other common law jurisdictions such as England and Canada, whose courts are otherwise regarded as models of judicial decorum and fairness." Oaks, *supra,* at 669.

Despite its avowed deterrent objective, proof is lacking that the exclusionary rule, a purely judge-created device based on "hard cases," serves the purpose of deterrence. Notwithstanding Herculean efforts, no empirical study has been able to demonstrate that the rule does in fact have any deterrent effect. In the face of dwindling support for the rule some would go so far as to extend it to *civil* cases. *United States* v. *Janis, ante,* p. 433.

To vindicate the continued existence of this judge-made rule, it is incumbent upon those who seek its retention—and surely its *extension*—to demonstrate that

it serves its declared deterrent purpose and to show that the results outweigh the rule's heavy costs to rational enforcement of the criminal law. See, *e. g., Killough* v. *United States,* 114 U. S. App. D. C. 305, 315 F. 2d 241 (1962). The burden rightly rests upon those who ask society to ignore trustworthy evidence of guilt, at the expense of setting obviously guilty criminals free to ply their trade.

In my view, it is an abdication of judicial responsibility to exact such exorbitant costs from society purely on the basis of speculative and unsubstantiated assumptions. Judge Henry Friendly has observed:

> "[T]he same authority that empowered the Court to supplement the [fourth] amendment by the exclusionary rule a hundred and twenty-five years after its adoption, likewise allows it to modify that rule as the 'lessons of experience' may teach." The Bill of Rights as a Code of Criminal Procedure, 53 Calif. L. Rev. 929, 952–953 (1965).

In *Bivens,* I suggested that, despite its grave shortcomings, the rule need not be totally abandoned until some meaningful alternative could be developed to protect innocent persons aggrieved by police misconduct. With the passage of time, it now appears that the continued existence of the rule, as presently implemented, inhibits the development of rational alternatives. The reason is quite simple: Incentives for developing new procedures or remedies will remain minimal or nonexistent so long as the exclusionary rule is retained in its present form.

It can no longer be assumed that other branches of government will act while judges cling to this Draconian, discredited device in its present absolutist form. Legislatures are unlikely to create statutory alternatives, or im-

pose direct sanctions on errant police officers or on the public treasury by way of tort actions, so long as persons who commit serious crimes continue to reap the enormous and undeserved benefits of the exclusionary rule. And of course, by definition the direct beneficiaries of this rule can be none but persons guilty of crimes. With this extraordinary "remedy" for Fourth Amendment violations, however slight, inadvertent, or technical, legislatures might assume that nothing more should be done, even though a grave defect of the exclusionary rule is that it offers no relief whatever to victims of overzealous police work who never appear in court. Schaefer, The Fourteenth Amendment and Sanctity of the Person, 64 Nw. U. L. Rev. 1, 14 (1969). And even if legislatures were inclined to experiment with alternative remedies, they have no assurance that the judicially created rule will be abolished or even modified in response to such legislative innovations. The unhappy result, as I see it, is that alternatives will inevitably be stymied by rigid adherence on our part to the exclusionary rule. I venture to predict that overruling this judicially contrived doctrine—or limiting its scope to egregious, bad-faith conduct—would inspire a surge of activity toward providing some kind of statutory remedy for persons injured by police mistakes or misconduct.

The Court's opinion today eloquently reflects something of the dismal social costs occasioned by the rule. *Ante,* at 489–491. As MR. JUSTICE WHITE correctly observes today in his dissent, the exclusionary rule constitutes a "senseless obstacle to arriving at the truth in many criminal trials." *Post,* at 538. He also suggests that the rule be substantially modified "so as to prevent its application in those many circumstances where the evidence at issue was seized by an officer acting in the good-faith belief that his conduct comported with exist-

ing law and having reasonable grounds for this belief." *Ibid.*

From its genesis in the desire to protect private papers, the exclusionary rule has now been carried to the point of potentially excluding from evidence the traditional *corpus delicti* in a murder or kidnaping case. See *People* v. *Mitchell,* 39 N. Y. 2d 173, 347 N. E. 2d 607, cert. denied, 426 U. S. 953 (1976). Cf. *Killough* v. *United States, supra.* Expansion of the reach of the exclusionary rule has brought Cardozo's grim prophecy in *People* v. *Defore,* 242 N. Y. 13, 24, 150 N. E. 585, 588 (1926), nearer to fulfillment:

> "A room is searched against the law, and the body of a murdered man is found. If the place of discovery may not be proved, the other circumstances may be insufficient to connect the defendant with the crime. The privacy of the home has been infringed, and the murderer goes free. . . . We may not subject society to these dangers until the Legislature has spoken with a clearer voice."

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL concurs, dissenting.

The Court today holds "that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Ante,* at 494. To be sure, my Brethren are hostile to the continued vitality of the exclusionary rule as part and parcel of the Fourth Amendment's prohibition of unreasonable searches and seizures, as today's decision in *United States* v. *Janis, ante,* p. 433, confirms. But these cases, despite the veil of Fourth Amendment terminology employed by the

Court, plainly do not involve any question of the right of a defendant to have evidence excluded from use against him in his criminal trial when that evidence was seized in contravention of rights ostensibly secured[1] by the Fourth and Fourteenth Amendments. Rather, they involve the question of the availability of a *federal forum* for vindicating those federally guaranteed rights. Today's holding portends substantial evisceration of federal habeas corpus jurisdiction, and I dissent.

The Court's opinion does not specify the particular basis on which it denies federal habeas jurisdiction over claims of Fourth Amendment violations brought by state prisoners. The Court insists that its holding is based on the Constitution, see, *e. g., ante,* at 482, but in light of the explicit language of 28 U. S. C. § 2254[2] (signifi-

---

[1] I say "ostensibly" secured both because it is clear that the Court has yet to make its final frontal assault on the exclusionary rule, and because the Court has recently moved in the direction of holding that the Fourth Amendment has no substantive content whatsoever. See, *e. g., United States* v. *Martinez-Fuerte, post,* at 567–569 (BRENNAN, J., dissenting), and cases cited therein.

[2] Title 28 U. S. C. § 2254 provides:

"§ 2254. State custody; remedies in State courts.

"(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

"(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

"(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning

cantly not even mentioned by the Court), I can only presume that the Court intends to be understood to hold either that respondents are not, as a matter of statutory

of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

"(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

"(1) that the merits of the factual dispute were not resolved in the State court hearing;

"(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

"(3) that the material facts were not adequately developed at the State court hearing;

"(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

"(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

"(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

"(7) that the applicant was otherwise denied due process of law in the State court proceeding;

"(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

"And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made,

construction, "in custody in violation of the Constitution or laws . . . of the United States," or that " 'considerations of comity and concerns for the orderly administration of criminal justice,' " *ante,* at 478 n. 11,[3] are sufficient

unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

"(e) If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination. If the applicant, because of indigency or other reason is unable to produce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official. If the State cannot provide such pertinent part of the record, then the court shall determine under the existing facts and circumstances what weight shall be given to the State court's factual determination.

"(f) A copy of the official records of the State court, duly certified by the clerk of such court to be a true and correct copy of a finding, judicial opinion, or other reliable written indicia showing such a factual determination by the State court shall be admissible in the Federal court proceeding."

[3] Title 28 U. S. C. § 2243 provides:

"§ 2243. Issuance of writ; return; hearing; decision.

"A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto.

"The writ, or order to show cause shall be directed to the person having custody of the person detained. It shall be returned within

to allow this Court to rewrite jurisdictional statutes enacted by Congress. Neither ground of decision is tenable; the former is simply illogical, and the latter is an arrogation of power committed solely to the Congress.

I

Much of the Court's analysis implies that respondents are not entitled to habeas relief because they are not being unconstitutionally detained. Although purportedly adhering to the principle that the Fourth and Fourteenth Amendments "require exclusion" of evidence seized in violation of their commands, *ante,* at 481, the Court informs us that there has merely been a "view" in our cases that "the effectuation of the Fourth Amendment . . . requires the granting of habeas corpus relief when a prisoner has been convicted in state court on the basis of evidence obtained in an illegal search or seizure . . . ." *Ante,* at 480–481.[4] Applying a "balancing

three days unless for good cause additional time, not exceeding twenty days, is allowed.

"The person to whom the writ or order is directed shall make a return certifying the true cause of the detention.

"When the writ or order is returned a day shall be set for hearing, not more than five days after the return unless for good cause additional time is allowed.

"Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.

"The applicant or the person detained may, under oath, deny any of the facts set forth in the return or allege any other material facts.

"The return and all suggestions made against it may be amended, by leave of court, before or after being filed.

"The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."

[4] See also, *e. g., ante,* at 486 ("The decision in *Kaufman* [v. *United States,* 394 U. S. 217 (1969),] is premised on the view that implementation of the Fourth Amendment also requires the consideration of search-and-seizure claims upon collateral review of state convic-

test," see, *e. g., ante,* at 487–489, 489–490, 493–494, the Court then concludes that this "view" is unjustified and that the policies of the Fourth Amendment would not be implemented if claims to the benefits of the exclusionary rule were cognizable in collateral attacks on state-court convictions.[5]

Understandably the Court must purport to cast its holding in constitutional terms, because that avoids a direct confrontation with the incontrovertible facts that the habeas statutes have heretofore always been construed to grant jurisdiction to entertain Fourth Amendment claims of both state and federal prisoners, that Fourth Amendment principles have been applied in decisions on the merits in numerous cases on collateral review of final convictions, and that Congress has legislatively accepted our interpretation of congressional intent as to

tions"); *ante,* at 489 ("The answer [to the question whether Fourth Amendment claims may be raised by state prisoners in federal habeas corpus proceedings] is to be found by weighing the utility of the exclusionary rule against the costs of extending it to collateral review of Fourth Amendment claims"); *ante,* at 493 ("[T]he additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs. . . . The view that the deterrence of Fourth Amendment violations would be furthered rests on the dubious assumption that law enforcement authorities would fear that federal habeas review might reveal flaws in a search or seizure that went undetected at trial and on appeal"); *ante,* at 494–495 ("In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal and the substantial societal costs of application of the rule persist with special force").

[5] To the extent the Court is rendering a constitutional holding, there is obviously no distinction between claims brought by state prisoners under 28 U. S. C. § 2254 and those brought by federal prisoners under 28 U. S. C. § 2255. Thus, the Court overrules not only a long line of cases concerning availability of habeas relief for state prisoners, but also a similarly inveterate line of cases concerning availability of counterpart § 2255 relief for federal prisoners.

the necessary scope and function of habeas relief. Indeed, the Court reaches its result without explicitly overruling any of our plethora of precedents inconsistent with that result or even discussing principles of *stare decisis*. Rather, the Court asserts, in essence, that the Justices joining those prior decisions or reaching the merits of Fourth Amendment claims simply overlooked the obvious constitutional dimension to the problem in adhering to the "view" that granting collateral relief when state courts erroneously decide Fourth Amendment issues would effectuate the principles underlying that Amendment.[6] But, shorn of the rhetoric of "interest balancing"

[6] Mr. Justice Black, dissenting in *Kaufman* v. *United States*, 394 U. S. 217 (1969), argued that in light of his view of the purposes of the exclusionary rule Fourth Amendment claims should not, as a matter of statutory construction, be cognizable on federal habeas. However, he never made the suggestion, apparently embraced by the Court today, that such claims cannot as a constitutional matter be entertained on habeas jurisdiction, even though Congress fashioned that jurisdiction at least in part to compensate for the inadequacies inherent in our certiorari jurisdiction on direct review. Cf. *ante*, at 481 n. 15, and 490. Indeed, *Kaufman* did not ignore the dissenting Justices' arguments; rather, it noted that habeas jurisdiction, apart from any effect on police behavior, serves the independent function of "insur[ing] the integrity of proceedings at and before trial where constitutional rights are at stake." 394 U. S., at 225. See also *infra*, at 519–522. As to the argument that our prior cases do not resolve the issue decided today because "only in the most exceptional cases will we consider issues not raised in the petition," see *ante*, at 481 n. 15, that claim is only valid to the extent the issue is one of construing congressional intent as to when, with respect to cases properly within the district court's power to grant relief, habeas relief should nevertheless be denied as a matter of discretion. But to the extent a person against whom unconstitutionally seized evidence was admitted at trial after a full and fair hearing is not "in custody in violation of the Constitution," there would be no jurisdiction even to entertain a habeas petition, see n. 2, *supra*, and such subject-matter-jurisdiction questions are always open— and must be resolved—at any stage of federal litigation. See, *e. g.*,

used to obscure what is at stake in this case, it is evident that today's attempt to rest the decision on the Constitution must fail so long as *Mapp* v. *Ohio,* 367 U. S. 643 (1961), remains undisturbed.

Under *Mapp,* as a matter of federal constitutional law, a state court *must* exclude evidence from the trial of an individual whose Fourth and Fourteenth Amendment rights were violated by a search or seizure that directly or indirectly resulted in the acquisition of that evidence. As *United States* v. *Calandra,* 414 U. S. 338, 347 (1974), reaffirmed, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." [7] When a state court admits such evidence, it has committed a *constitutional* error, and unless that error is harmless under federal standards, see, *e. g., Chapman* v. *California,* 386 U. S. 18 (1967), it follows ineluctably that the defendant has been placed "in custody in violation of the Constitution" within the comprehension of 28 U. S. C. § 2254. In short, it escapes me as to what logic can support the assertion that the defendant's unconstitutional confinement obtains during the process of direct review, no matter how long that process takes,[8]

---

*Louisville & Nashville R. Co.* v. *Mottley,* 211 U. S. 149 (1908); Fed. Rule Civ. Proc. 12 (h). It borders on the incredible to suggest that so many Justices for so long merely "assumed" the answer to such a basic jurisdictional question.

[7] See also 414 U. S., at 351, noting "inadmissibility of the illegally seized evidence in a subsequent criminal prosecution of the search victim."

[8] Only once does the Court advert to any temporal distinction between direct review and collateral review as a possible reason for precluding the raising of Fourth Amendment claims during the former and not during the latter proceedings. See *ante,* at 493 (arguing that deterrence would not be "enhanced" by the risk "that a conviction obtained in state court and affirmed on direct review might be overturned in collateral proceedings often occurring

but that the unconstitutionality then suddenly dissipates at the moment the claim is asserted in a collateral attack on the conviction.

The only conceivable rationale upon which the Court's "constitutional" thesis might rest is the statement that "the [exclusionary] rule is not a personal constitutional right. . . . Instead, 'the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *Ante,* at 486, quoting *United States* v. *Calandra, supra,* at 348. Although my dissent in *Calandra* rejected, in light of contrary decisions establishing the role of the exclusionary rule, the premise that an individual has no constitutional right to have unconstitutionally seized evidence excluded from all use by the government, I need not dispute that point here.[9] For today's holding is not logically defensible even under *Calandra.* However the Court reinterprets *Mapp,* and whatever the rationale now attributed to *Mapp*'s holding or the purpose ascribed to the exclusionary rule, the prevailing constitutional *rule* is that unconstitutionally seized evidence *cannot be admitted* in the criminal trial of a person whose federal constitutional rights were violated by the search or seizure. The erroneous admission of such evidence is a violation of the Federal Constitution—*Mapp* inexorably means at least this much, or there would be no basis for applying the exclusionary rule in state criminal proceedings—and an

years after the incarceration of the defendant"). Of course, it is difficult to see how the Court could constitutionalize any such asserted temporal distinctions, particularly in light of the differential speed with which criminal cases proceed even on direct appeal.

[9] It is unnecessary here to expand upon my reasons for disagreement, which are stated fully in my dissents in *United States* v. *Calandra,* 414 U. S., at 355–367, and *United States* v. *Peltier,* 422 U. S. 531, 550–562 (1975).

accused against whom such evidence is admitted has been convicted in derogation of rights mandated by, and is "in custody in violation of," the Constitution of the United States. Indeed, since state courts violate the strictures of the Federal Constitution by admitting such evidence, then even if federal habeas review did not directly effectuate Fourth Amendment values, a proposition I deny, that review would nevertheless serve to effectuate what is concededly a constitutional principle concerning admissibility of evidence at trial.

The Court, assuming without deciding that respondents were convicted on the basis of unconstitutionally obtained evidence erroneously admitted against them by the state trial courts, acknowledges that respondents had the right to obtain a reversal of their convictions on appeal in the state courts or on certiorari to this Court. Indeed, since our rules relating to the time limits for applying for certiorari in criminal cases are nonjurisdictional, certiorari could be granted respondents even today and their convictions could be reversed despite today's decisions. See also *infra,* at 533–534. And the basis for reversing those convictions would of course have to be that the States, in rejecting respondents' Fourth Amendment claims, had deprived them of a right in derogation of the Federal Constitution. It is simply inconceivable that that constitutional deprivation suddenly vanishes after the appellate process has been exhausted. And as between this Court on certiorari, and federal district courts on habeas, it is for *Congress* to decide what the most efficacious method is for enforcing *federal* constitutional rights and asserting the primacy of federal law. See *infra,* at 522, 525–530. The Court, however, simply ignores the settled principle that for purposes of adjudicating constitutional claims Congress, which has the power to do so under Art. III of the Constitution, has effectively

cast the district courts sitting in habeas in the role of surrogate Supreme Courts.[10]

Today's opinion itself starkly exposes the illogic of the Court's seeming premise that the rights recognized

---

[10] The failure to confront this fact forthrightly is obviously a core defect in the Court's analysis. For to the extent Congress has accorded the federal district courts a role in our constitutional scheme functionally equivalent to that of the Supreme Court with respect to review of state-court resolutions of federal constitutional claims, it is evident that the Court's direct/collateral review distinction for constitutional purposes simply collapses. Indeed, logically extended, the Court's analysis, which basically turns on the fact that law enforcement officials cannot anticipate a second court's finding constitutional errors after one court has fully and fairly adjudicated the claim and found it to be meritless, would preclude any Supreme Court review on direct appeal or even state appellate review if the trial court fairly addressed the Fourth Amendment claim on the merits. The proposition is certainly frivolous if *Mapp* is constitutionally grounded; yet such is the essential thrust of the Court's view that the unconstitutional admission of evidence is tolerable merely because police officials cannot be deterred from unconstitutional conduct by the possibility that a favorable "admission" decision would be followed by an unfavorable "exclusion" decision.

The Court's arguments respecting the cost/benefit analysis of applying the exclusionary rule on collateral attack also have no merit. For all of the "costs" of applying the exclusionary rule on habeas *should already have been incurred* at the trial or on direct review if the state court had not misapplied federal constitutional principles. As such, these "costs" were evaluated and deemed to be outweighed when the exclusionary rule was fashioned. The only proper question on habeas is whether federal courts, acting under congressional directive to have the last say as to enforcement of federal constitutional principles, are to permit the States free enjoyment of the fruits of a conviction which by definition were only obtained through violations of the Constitution as interpreted in *Mapp*. And as to the question whether any "educative" function is served by such habeas review, see *ante,* at 493, today's decision will certainly provide a lesson that, tragically for an individual's

in *Mapp* somehow suddenly evaporate after all direct appeals are exhausted. For the Court would not bar assertion of Fourth Amendment claims on habeas if the

constitutional rights, will not be lost on state courts. See *infra,* at 530–533.

Another line of analysis exposes the fallacy of treating today's holding as a constitutional decision. Constitutionally, no barrier precludes a state defendant from immediately seeking a federal court's injunction against any state use of unconstitutionally seized evidence against him at trial. However, equitable principles have operated to foreclose cutting short the normal *initial* adjudication of such constitutional defenses in the course of a criminal prosecution, *Dombrowski* v. *Pfister,* 380 U. S. 479, 485 n. 3 (1965), subject to ultimate federal review either on direct review or collaterally through habeas. See also, *e. g., Younger* v. *Harris,* 401 U. S. 37 (1971). Moreover, considerations of comity, now statutorily codified as the exhaustion requirement of § 2254, and not lack of power, dictate that federal habeas review be delayed pending the initial state-court determination. But delay only was the price, "else a rule of timing would become a rule circumscribing the power of the federal courts on habeas, in defiance of unmistakable congressional intent." *Fay* v. *Noia,* 372 U. S. 391, 420 (1963); see *id.,* at 417–426. The Court today, however, converts this doctrine dictating the timing of federal review into a doctrine *precluding* federal review, see *Francis* v. *Henderson,* 425 U. S. 536, 542 (1976) (BRENNAN, J., dissenting); such action is in keeping with the regrettable recent trend of barring the federal courthouse door to individuals with meritorious claims. See, *e. g., Warth* v. *Seldin,* 422 U. S. 490 (1975); *Rizzo* v. *Goode,* 423 U. S. 362 (1976); *Simon* v. *Eastern Kentucky Welfare Rights Org.,* 426 U. S. 26 (1976). Although the federal courts could have been the forum for the initial "opportunity for a full and fair hearing" of Fourth Amendment claims of state prisoners that the Court finds constitutionally sufficient, nonconstitutional concerns dictated temporary abstention; but having so abstained, federal courts are now ousted by this Court from ever determining the claims, since the courts to which they initially deferred are all that this Court deems necessary for protecting rights essential to preservation of the Fourth Amendment. Such hostility to federal jurisdiction to redress violations of rights secured by the Federal Constitution, despite congressional conferral of that jurisdiction, is profoundly disturbing.

defendant was not accorded "an opportunity for full and fair litigation of his claim in the state courts." *Ante,* at 469. See also *ante,* at 480, quoting *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 250 (1973) (POWELL, J., concurring); *ante,* at 482, 486, 489–490, 493–494, and n. 37. But this "exception" is impossible if the Court really means that the "rule" that Fourth Amendment claims ·are not cognizable on habeas is constitutionally based. For if the Constitution mandates that "rule" because it is a "dubious assumption that law enforcement authorities would fear that federal habeas review might reveal flaws in a search or seizure that went undetected at trial and on appeal," *ante,* at 493, is it not an equally "dubious assumption" that those same police officials would fear that federal habeas review might reveal that the state courts had denied the defendant an opportunity to have a full and fair hearing on his claim that went undetected at trial and on appeal?[11] And to the extent the Court is making the unjustifiable assumption that our certiorari jurisdiction is adequate to correct "routine" condonation of Fourth Amendment violations by state courts, surely it follows *a fortiori* that our jurisdiction is adequate to redress the "egregious" situation in which the state courts did not even accord a fair hearing on the Fourth Amendment claim. The "exception" thus may appear to make the holding more palatable, but it merely highlights the lack of a "constitutional" rationale for today's constriction of habeas jurisdiction.

The Court adheres to the holding of *Mapp* that the Constitution "require[d] exclusion" of the evidence admitted at respondents' trials. *Ante,* at 481. However,

---

[11] In arguing in the Court's "deterrence" idiom, I emphasize that I am accepting the Court's assumptions concerning the purposes of the exclusionary rule only to demonstrate that, on its own premises, today's decision is unsupportable.

the Court holds that the Constitution "does not require" that respondents be accorded habeas relief if they were accorded "an opportunity for full and fair litigation of [their] Fourth Amendment claim[s]" in state courts. *Ante,* at 482; see also *ante,* at 495 n. 37. Yet once the Constitution was interpreted by *Mapp* to require exclusion of certain evidence at trial, the Constitution became irrelevant to the manner in which that constitutional right was to be enforced in the federal courts; *that* inquiry is only a matter of respecting Congress' allocation of federal judicial power between this Court's appellate jurisdiction and a federal district court's habeas jurisdiction. Indeed, by conceding that today's "decision does not mean that the federal [district] court lacks jurisdiction over [respondents'] claim[s]," *ibid.,* the Court admits that respondents have sufficiently alleged that they are "in custody in violation of the Constitution" within the meaning of § 2254 and that there is no "constitutional" rationale for today's holding. Rather, the constitutional "interest balancing" approach to this case is untenable, and I can only view the constitutional garb in which the Court dresses its result as a disguise for rejection of the longstanding principle that there are no "second class" constitutional rights for purposes of federal habeas jurisdiction; it is nothing less than an attempt to provide a veneer of respectability for an obvious usurpation of Congress' Art. III power to delineate the jurisdiction of the federal courts.

## II

Therefore, the real ground of today's decision—a ground that is particularly troubling in light of its portent for habeas jurisdiction generally—is the Court's novel reinterpretation of the habeas statutes; this would read the statutes as requiring the district courts rou-

tinely to deny habeas relief to prisoners "in custody in violation of the Constitution or laws . . . of the United States" as a matter of judicial "discretion"—a "discretion" judicially manufactured today contrary to the express statutory language—because such claims are "different in kind" from other constitutional violations in that they "do not 'impugn the integrity of the fact-finding process,'" *ante,* at 479, and because application of such constitutional strictures "often frees the guilty." *Ante,* at 490. Much in the Court's opinion suggests that a construction of the habeas statutes to deny relief for non-"guilt-related" constitutional violations, based on this Court's vague notions of comity and federalism, see, *e. g., ante,* at 478 n. 11, is the actual premise for today's decision, and although the Court attempts to bury its underlying premises in footnotes, those premises mark this case as a harbinger of future eviscerations of the habeas statutes that plainly does violence to congressional power to frame the statutory contours of habeas juridiction.[12] For we are told that "[r]esort to habeas corpus, especially for purposes other than to assure that no innocent person suffers an unconstitutional loss of liberty, results in serious intrusions on values important to our system of government," including waste of judicial resources, lack of finality of criminal convictions, friction between the federal and state judiciaries, and incursions on "federalism." *Ante,* at 491 n. 31. We are told that federal determination of Fourth Amendment claims merely involves "an issue that has no bearing on the basic justice of [the defend-

---

[12] For proof that my fears concerning the precedential use to which today's opinion will be put are not groundless, see, *e. g., Francis* v. *Henderson,* 425 U. S. 536 (1976), and *Estelle* v. *Williams,* 425 U. S. 501 (1976), which illustrate the Court's willingness to construe the habeas statutes so as to cabin the scope of habeas relief for criminal defendants.

ant's] incarceration," *ante,* at 492 n. 31, and that "the ultimate question [in the criminal process should invariably be] guilt or innocence." *Ante,* at 490; see also *ante,* at 491 n. 30; *ante,* at 490, quoting *Kaufman* v. *United States,* 394 U. S. 217, 237 (1969) (Black, J., dissenting). We are told that the "policy arguments" of respondents to the effect that federal courts must be the ultimate arbiters of federal constitutional rights, and that our certiorari jurisdiction is inadequate to perform this task, "stem from a basic mistrust of the state courts as fair and competent forums for the adjudication of federal constitutional rights"; the Court, however, finds itself "unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States," and asserts that it is "unpersuaded" by "the argument that federal judges are more expert in applying federal constitutional law" because "there is 'no intrinsic reason why the fact that a man is a federal judge should make him more competent, or conscientious, or learned with respect to the [consideration of Fourth Amendment claims] than his neighbor in the state courthouse.'" *Ante,* at 493–494, n. 35. Finally, we are provided a revisionist history of the genesis and growth of federal habeas corpus jurisdiction. *Ante,* at 474–482 (Part II). If today's decision were only that erroneous state-court resolution of Fourth Amendment claims did not render the defendant's resultant confinement "in violation of the Constitution," these pronouncements would have been wholly irrelevant and unnecessary. I am therefore justified in apprehending that the groundwork is being laid today for a drastic withdrawal of federal habeas jurisdiction, if not for all grounds of alleged unconstitutional detention, then at least for claims—for example, of double jeopardy, entrapment, self-incrimination, *Miranda* viola-

tions, and use of invalid identification procedures [13]—that this Court later decides are not "guilt related."

To the extent the Court is actually premising its holding on an interpretation of 28 U. S. C. § 2241 or § 2254, it is overruling the heretofore settled principle that federal habeas relief is available to redress *any* denial of asserted constitutional rights, whether or not denial of the right affected the truth or fairness of the factfinding process. As MR. JUSTICE POWELL recognized in proposing that the Court re-evaluate the scope of habeas relief as a statutory matter in *Schneckloth* v. *Bustamonte,* 412 U. S., at 251 (concurring opinion), "on petition for habeas corpus or collateral review filed in a federal district court, whether by state prisoners under 28 U. S. C. § 2254 or federal prisoners under § 2255, the present rule is that Fourth Amendment claims may be asserted and the exclusionary rule must be applied in precisely the same manner as on direct review." This Court has on numerous occasions accepted jurisdiction over collateral attacks by state prisoners premised on Fourth Amendment violations, often over dissents that as a statutory matter such claims should not be cognizable. See, *e. g., Lefkowitz* v. *Newsome,* 420 U. S. 283, 291–292, and nn. 8, 9 (1975); *Cardwell* v. *Lewis,* 417 U. S. 583 (1974); *Cady* v. *Dombrowski,* 413 U. S. 433 (1973); *Adams* v. *Williams,* 407 U. S. 143 (1972); *Whiteley* v. *Warden,* 401 U. S. 560 (1971); *Chambers* v. *Maroney,* 399 U. S. 42 (1970); *Har-*

---

[13] Others might be claims of official surveillance of attorney-client communications, government acquisition of evidence through unconscionable means, see, *e. g., Rochin* v. *California,* 342 U. S. 165 (1952), denial of the right to a speedy trial, government administration of a "truth serum," see *Townsend* v. *Sain,* 372 U. S. 293 (1963), denial of the right to jury trial, see *Ludwig* v. *Massachusetts,* 427 U. S. 618, 627 n. 3 (1976), or the obtaining of convictions under statutes that contravene First Amendment rights when a properly drawn statute could have been applied to the particular defendant's conduct.

*ris* v. *Nelson,* 394 U. S. 286 (1969) ; *Mancusi* v. *DeForte,* 392 U. S. 364 (1968) ; *Carafas* v. *LaVallee,* 391 U. S. 234 (1968) ; *Warden* v. *Hayden,* 387 U. S. 294 (1967). Consideration of the merits in each of these decisions reaffirmed the unrestricted scope of habeas jurisdiction, but each decision must be deemed overruled by today's holding.[14]

Federal habeas corpus review of Fourth Amendment claims of state prisoners was merely one manifestation of the principle that "conventional notions of finality in criminal litigation cannot be permitted to defeat the manifest federal policy that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal judicial review." *Fay* v. *Noia,* 372 U. S. 391, 424 (1963). This Court's precedents have been "premised in large part on a recognition that the availability of collateral remedies is necessary to insure the integrity of proceedings at and before trial where constitutional rights are at stake. Our decisions leave no doubt that the federal habeas remedy extends

[14] The overruling of *Lefkowitz* v. *Newsome,* decided only last Term, is particularly ironic. That case held that a state defendant could file a federal habeas corpus petition asserting Fourth Amendment claims, despite a subsequent guilty plea, when the State provided for appellate review of those claims. Three Justices dissented and would have held, as a statutory matter, that Fourth Amendment claims are not cognizable on federal habeas, but none suggested the "constitutional" thesis embraced by the Court as the ostensible *ratio decidendi* for today's cases.

Although the Court does not expressly overrule *Kaufman* v. *United States,* 394 U. S. 217 (1969), and its progeny involving collateral review of Fourth Amendment claims of federal prisoners (indeed, the Court accomplishes today's results without expressly overruling or distinguishing *any* of our diametrically contrary precedents), *Kaufman* obviously does not survive. This tactic has become familiar in earlier decisions this Term. See, *e. g., Hudgens* v. *NLRB,* 424 U. S. 507 (1976); *Francis* v. *Henderson,* 425 U. S. 536 (1976); *Greer* v. *Spock,* 424 U. S. 828 (1976).

to state prisoners alleging that unconstitutionally obtained evidence was admitted against them at trial." *Kaufman* v. *United States,* 394 U. S., at 225. Some of those decisions explicitly considered and rejected the "policies" referred to by the Court, *ante,* at 491–492, n. 31. *E. g., Brown* v. *Allen,* 344 U. S. 443 (1953); *Fay* v. *Noia, supra; Kaufman* v. *United States, supra.* There were no "assumptions" with respect to the construction of the habeas statutes, but reasoned decisions that those policies were an insufficient justification for shutting the federal habeas door to litigants with federal constitutional claims in light of such countervailing considerations as "the necessity that federal courts have the 'last say' with respect to questions of federal law, the inadequacy of state procedures to raise and preserve federal claims, the concern that state judges may be unsympathetic to federally created rights, [and] the institutional constraints on the exercise of this Court's certiorari jurisdiction to review state convictions," 394 U. S., at 225–226, as well as the fundamental belief "that adequate protection of constitutional rights relating to the criminal trial process requires the continuing availability of a mechanism for relief." *Id.,* at 226. See generally, *e. g., Fay* v. *Noia, supra; Townsend* v. *Sain,* 372 U. S. 293 (1963). As Mr. Justice Harlan, who had dissented from many of the cases initially construing the habeas statutes, readily recognized, habeas jurisdiction as heretofore accepted by this Court was "not only concerned with those rules which substantially affect the fact-finding apparatus of the original trial. Under the prevailing notions, *Kaufman* v. *United States, supra,* at 224–226, *the threat of habeas serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards." Desist* v.

*United States,* 394 U. S. 244, 262–263 (1969) (dissenting) (emphasis supplied). The availability of collateral review assures "that the lower federal and state courts toe the constitutional line." *Id.,* at 264. "[H]abeas lies to inquire into every constitutional defect in any criminal trial, where the petitioner remains 'in custody' because of the judgment in that trial, unless the error committed was knowingly and deliberately waived or constitutes mere harmless error. That seems to be the implicit premise of *Brown* v. *Allen, supra,* and the clear purport of *Kaufman* v. *United States, supra.* . . . The primary justification given by the Court for extending the scope of habeas to all alleged constitutional errors is that it provides a quasi-appellate review function, forcing trial and appellate courts in both the federal and state system to toe the constitutional mark." *Mackey* v. *United States,* 401 U. S. 667, 685–687 (1971) (opinion of Harlan, J.). See also *Brown* v. *Allen, supra,* at 508 (opinion of Frankfurter, J.) ("[N]o binding weight is to be attached to the State determination. The congressional requirement is greater. The State court cannot have the last say when it, though on fair consideration of what procedurally may be deemed fairness, may have misconceived a federal constitutional right"); *Fay* v. *Noia, supra,* at 422. In effect, habeas jurisdiction is a deterrent to unconstitutional actions by trial and appellate judges, and a safeguard to ensure that rights secured under the Constitution and federal laws are not merely honored in the breach. "[I]ts function has been to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints." *Id.,* at 401–402. "[T]he historical role of the writ of habeas corpus [is that of] an effective and imperative remedy for detentions contrary to fundamental law." *Id.,* at 438.

At least since *Brown* v. *Allen, supra,* detention emanat-

ing from judicial proceedings in which constitutional rights were denied has been deemed "contrary to fundamental law," and all constitutional claims have thus been cognizable on federal habeas corpus. There is no foundation in the language or history of the habeas statutes for discriminating between types of constitutional transgressions, and efforts to relegate certain categories of claims to the status of "second-class rights" by excluding them from that jurisdiction have been repulsed.[15] Today's opinion, however, marks the triumph of those who have sought to establish a hierarchy of constitutional rights, and to deny for all practical purposes a federal forum for review of those rights that this Court deems less worthy or important. Without even paying the slightest deference to principles of *stare decisis* or acknowledging Congress' failure for two decades to alter the habeas statutes in light of our interpretation of congressional intent to render all federal constitutional contentions cognizable on habeas, the Court today rewrites Congress' jurisdictional statutes as heretofore construed and bars access to federal courts by state prisoners with constitutional claims distasteful to a majority of my Brethren. But even ignoring principles of *stare decisis* dictating that Congress is the appropriate vehicle for embarking on such a fundamental shift in the jurisdiction of the federal courts, I can find no adequate justification elucidated by the Court for concluding that habeas relief for all federal constitutional claims is no longer compelled under the reasoning of *Brown, Fay,* and *Kaufman.*

I would address the Court's concerns for effective utili-

---

[15] My Brother WHITE's hypothesis of two confederates in crime, see *post,* at 536–537, fully demonstrates the type of discrimination that Congress clearly sought to avoid if, out of the full universe of constitutional rights, certain rights could be vindicated only by resort to this Court's certiorari jurisdiction.

zation of scarce judicial resources, finality principles, federal-state friction, and notions of "federalism" only long enough to note that such concerns carry no more force with respect to non-"guilt-related" constitutional claims than they do with respect to claims that affect the accuracy of the factfinding process. Congressional conferral of federal habeas jurisdiction for the purpose of entertaining petitions from state prisoners necessarily manifested a conclusion that such concerns could not be controlling, and any argument for discriminating among constitutional rights must therefore depend on the nature of the constitutional right involved.

The Court, focusing on Fourth Amendment rights as it must to justify such discrimination, thus argues that habeas relief for non-"guilt-related" constitutional claims is not mandated because such claims do not affect the "basic justice" of a defendant's detention, see *ante,* at 492 n. 31; this is presumably because the "ultimate goal" of the criminal justice system is "truth and justice." *E. g., ante,* at 490, and 491 n. 30.[16] This denigration of constitutional guarantees and *constitutionally mandated procedures,* relegated by the Court to the status of mere utilitarian tools, must appall citizens taught to expect judicial respect and support for their constitutional rights. Even if punishment of the "guilty" were society's highest value—and procedural safeguards denigrated to this end—in a constitution that a majority of the Members of this Court would prefer, that is not the ordering of priorities under the Constitution forged by the Framers, and this Court's sworn duty is to uphold that Constitu-

---

[16] The Court also notes that "attention . . . [is] diverted" when trial courts address exclusionary rule issues, *ante,* at 490, and with the result that application of the rule "often frees the guilty." *Ibid.* Of course, these "arguments" are true with respect to every constitutional guarantee governing administration of the criminal justice system.

tion and not to frame its own. The procedural safeguards mandated in the Framers' Constitution are not admonitions to be tolerated only to the extent they serve functional purposes that ensure that the "guilty" are punished and the "innocent" freed; rather, every guarantee enshrined in the Constitution, our basic charter and the guarantor of our most precious liberties, is by it endowed with an independent vitality and value, and this Court is not free to curtail those constitutional guarantees even to punish the most obviously guilty. Particular constitutional rights that do not affect the fairness of factfinding procedures cannot for that reason be denied at the trial itself. What possible justification then can there be for denying vindication of such rights on federal habeas when state courts do deny those rights at trial? To sanction disrespect and disregard for the Constitution in the name of protecting society from lawbreakers is to make the government itself lawless and to subvert those values upon which our ultimate freedom and liberty depend.[17] "The history of American freedom

[17] "Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead* v. *United States,* 277 U. S. 438, 479 (1928) (Brandeis, J., dissenting). See also *id.,* at 483, 485.

"We are duly mindful of the reliance that society must place for achieving law and order upon the enforcing agencies of the criminal law. But insistence on observance by law officers of traditional fair procedural requirements is, from the long point of view, best calculated to contribute to that end. However much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of the criminal law proves that tolerance of short-cut methods in law enforcement impairs its enduring effectiveness." *Miller* v. *United States,* 357 U. S. 301, 313 (1958). See also *Boyd* v. *United States,* 116 U. S.

is, in no small measure, the history of procedure," *Malin-ski* v. *New York*, 324 U. S. 401, 414 (1945) (opinion of Frankfurter, J.), and as Mr. Justice Holmes so succinctly reminded us, it is "a less evil that some criminals should escape than that the Government should play an ignoble part." *Olmstead* v. *United States*, 277 U. S. 438, 470 (1928) (dissenting opinion). "[I]t is an abuse to deal too casually and too lightly with rights guaranteed by the Federal Constitution, even though they involve limitations upon State power and may be invoked by those morally unworthy." *Brown* v. *Allen*, 344 U. S., at 498 (opinion of Frankfurter, J.). Enforcement of *federal* constitutional rights that redress constitutional violations directed against the "guilty" is a particular function of *federal* habeas review, lest judges trying the "morally unworthy" be tempted not to execute the supreme law of the land. State judges popularly elected may have difficulty resisting popular pressures not experienced by federal judges given lifetime tenure designed to immunize them from such influences, and the federal habeas statutes reflect the congressional judgment that such detached federal review is a salutary safeguard against *any* detention of an individual "in violation of the Constitution or laws . . . of the United States."

Federal courts have the duty to carry out the congres-

616, 635 (1886); *Weeks* v. *United States*, 232 U. S. 383, 392–394 (1914).

The Court asserts that "the hyperbole of the dissenting opinion is misdirected," *ante*, at 495 n. 37, but I take seriously this Court's continuing incursions on constitutionally guaranteed rights. "[I]lle-gitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. . . . It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd* v. *United States, supra*, at 635.

sionally assigned responsibility to shoulder the ultimate
burden of adjudging whether detentions violate federal
law, and today's decision substantially abnegates that
duty. The Court does not, because it cannot, dispute
that institutional constraints totally preclude any possi-
bility that this Court can adequately oversee whether
state courts have properly applied federal law,[18] and does
not controvert the fact that federal habeas jurisdiction is
partially designed to ameliorate that inadequacy. Thus,
although I fully agree that state courts "have a constitu-
tional obligation to safeguard personal liberties and to
uphold federal law," and that there is no "general lack of
appropriate sensitivity to constitutional rights in the trial
and appellate courts of the several States," *ante,* at 494 n.
35, I cannot agree that it follows that, as the Court today
holds, federal-court determination of almost all Fourth
Amendment claims of state prisoners should be barred
and that state-court resolution of those issues should be
insulated from the federal review Congress intended.
For, as Mr. Justice Frankfurter so aptly framed the issue
in rejecting similar contentions in construing the habeas
statutes in *Brown* v. *Allen, supra:*

> "Congress could have left the enforcement of fed-
> eral constitutional rights governing the administra-
> tion of criminal justice in the States exclusively to
> the State courts. These tribunals are under the
> same duty as the federal courts to respect rights
> under the United States Constitution. . . . It is not
> for us to determine whether this power should have
> been vested in the federal courts. . . . [*T*]*he wisdom
> of such a modification in the law is for Congress to*

---

[18] These considerations were powerfully articulated in *Brown* v.
*Allen,* 344 U. S. 443, 491–494 (1953) (opinion of Frankfurter, J.).
Cf. also *Fay* v. *Noia,* 372 U. S., at 432–433; *England* v. *Louisiana
State Board of Medical Examiners,* 375 U. S. 411, 415–417 (1964).

*consider,* particularly in view of the effect of the expanding concept of due process upon enforcement by the States of their criminal laws. *It is for this Court to give fair effect to the habeas corpus jurisdiction as enacted by Congress. By giving the federal courts that jurisdiction, Congress has imbedded into federal legislation the historic function of habeas corpus adapted to reaching an enlarged area of claims.* . . .

". . . But the prior State determination of a claim under the United States Constitution cannot foreclose consideration of such a claim, else the State court would have the final say which the Congress, by the Act of 1867, provided it should not have." 344 U. S., at 499–500 (emphasis supplied).

"State adjudication of questions of law cannot, under the habeas corpus statute, be accepted as binding. It is precisely these questions that the federal judge is commanded to decide." *Id.,* at 506.

"Congress has the power to distribute among the courts of the States and of the United States jurisdiction to determine federal claims. It has seen fit to give this Court power to review errors of federal law in State determinations, and in addition to give to the lower federal courts power to inquire into federal claims, by way of habeas corpus. . . . But it would be in disregard of what Congress has expressly required to deny State prisoners access to the federal courts.

". . . Insofar as this jurisdiction enables federal district courts to entertain claims that State Supreme Courts have denied rights guaranteed by the United States Constitution, it is not a case of a lower court sitting in judgment on a higher court. *It is merely one aspect of respecting the Supremacy Clause of the*

> *Constitution whereby federal law is higher than State law. It is for the Congress to designate the member in the hierarchy of the federal judiciary to express the higher law.* The fact that Congress has authorized district courts to be the organ of the higher law rather than a Court of Appeals, or exclusively this Court, does not mean that it allows a lower court to overrule a higher court. It merely expresses the choice of Congress how the superior authority of federal law should be asserted." 344 U. S., at 508–510 (emphasis supplied).

Congress' action following *Townsend* v. *Sain,* 372 U. S. 293 (1963), and *Fay* v. *Noia,* 372 U. S. 391 (1963), emphasized "the choice of Congress how the superior authority of federal law should be asserted" in federal courts. *Townsend* v. *Sain* outlined the duty of federal habeas courts to conduct factfinding hearings with respect to petitions brought by state prisoners, and *Fay* v. *Noia* defined the contours of the "exhaustion of state remedies" prerequisite in § 2254 in light of its purpose of according state courts the first opportunity to correct their own constitutional errors. Congress expressly modified the habeas statutes to incorporate the *Townsend* standards so as to accord a limited and carefully circumscribed res judicata effect to the factual determinations of state judges. But Congress did not alter the principle of *Brown, Fay,* and *Kaufman* that collateral relief is to be available with respect to *any* constitutional deprivation and that federal district judges, subject to review in the courts of appeals and this Court, are to be the spokesmen of the supremacy of federal law. Indeed, subsequent congressional efforts to amend those jurisdictional statutes to effectuate the result that my Brethren accomplish by judicial fiat have

consistently proved unsuccessful. There remains, as noted before, no basis whatsoever in the language or legislative history of the habeas statutes for establishing such a hierarchy of federal rights; certainly there is no constitutional warrant in this Court to override a congressional determination respecting federal-court review of decisions of state judges determining constitutional claims of state prisoners.

In any event, respondents' contention that Fourth Amendment claims, like all other constitutional claims, must be cognizable on habeas, does not rest on the ground attributed to them by the Court—that the state courts are rife with animosity to the constitutional mandates of this Court. It is one thing to assert that state courts, as a general matter, accurately decide federal constitutional claims; it is quite another to generalize from that limited proposition to the conclusion that, despite congressional intent that federal courts sitting in habeas must stand ready to rectify any constitutional errors that are nevertheless committed, federal courts are to be judicially precluded from ever considering the merits of whole categories of rights that are to be accorded less procedural protection merely because the Court proclaims that they do not affect the accuracy or fairness of the factfinding process. "Under the guise of fashioning a procedural rule, we are not justified in wiping out the practical efficacy of a jurisdiction conferred by Congress on the District Courts. Rules which in effect treat all these cases indiscriminately as frivolous do not fall far short of abolishing this head of jurisdiction." *Brown* v. *Allen,* 344 U. S., at 498–499 (opinion of Frankfurter, J.). To the extent state trial and appellate judges faithfully, accurately, and assiduously apply federal law and the constitutional principles enunciated by the federal

courts, such determinations will be vindicated on the merits when collaterally attacked. But to the extent federal law is erroneously applied by the state courts, there is no authority in this Court to deny defendants the right to have those errors rectified by way of federal habeas; [19] indeed, the Court's reluctance to accept Congress' desires along these lines can only be a manifestation of this Court's mistrust for *federal* judges. Furthermore, some might be expected to dispute the academic's dictum seemingly accepted by the Court that a federal judge is not necessarily more skilled than a state judge in applying federal law. See *ante,* at 494 n. 35. For the Supremacy Clause of the Constitution proceeds on a different premise, and Congress, as it was constitutionally empowered to do, made federal judges (and initially federal district court judges) "the *primary* and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States." *Zwickler* v. *Koota,* 389 U. S. 241, 247 (1967).

If proof of the necessity of the federal habeas jurisdiction were required, the disposition by the state courts of the underlying Fourth Amendment issues presented by these cases supplies it. In No. 74–1055, respondent was arrested pursuant to a statute which obviously is unconstitutional under *Papachristou* v. *City of Jacksonville,* 405 U. S. 156 (1972). Even apart from its vagueness and concomitant potential for arbitrary and discriminatory enforcement, the statute purports to criminalize the presence of one unable to account for his presence in a situation where a reasonable person might believe that pub-

---

[19] See *Brown* v. *Allen,* 344 U. S., at 497–499 (opinion of Frankfurter, J.). "The meritorious claims are few, but our procedures must ensure that those few claims are not stifled by undiscriminating generalities." *Id.,* at 498.

lic safety demands identification. See *ante*, at 469 n. 1.
It is no crime in a free society not to have "identification
papers" on one's person, and the statute is a palpable
effort to enable police to arrest individuals on the basis
of mere suspicion and to facilitate detention even when
there is no probable cause to believe a crime has been
or is likely to be committed. See 405 U. S., at 168–170.
Without elaborating on the various arguments buttressing
this result, including the self-incrimination aspects of the
ordinance and its attempt to circumvent Fourth Amend-
ment safeguards in a situation that, under *Terry* v. *Ohio*,
392 U. S. 1 (1968), would at most permit law enforce-
ment officials to conduct a protective search for weapons,
I would note only that the ordinance, due to the Court's
failure to address its constitutionality today, remains in
full force and effect, thereby affirmatively encouraging
further Fourth Amendment violations. Moreover, the
fact that only a single state judge ever addressed the
validity of the ordinance, and the lack of record evidence
as to why or how he rejected respondent's claim, gives me
pause as to whether there is any real content to the
Court's "exception" for bringing Fourth Amendment
claims on habeas in situations in which state prisoners
were not accorded an opportunity for a full and fair state-
court resolution of those claims; that fact also makes
irrelevant the Court's presumption that deterrence is not
furthered when there is federal habeas review of a search-
and-seizure claim that was erroneously rejected by "two
or more tiers of state courts." *Ante*, at 491.

Even more violative of constitutional safeguards is the
manner in which the Nebraska courts dealt with the
merits in respondent Rice's case. Indeed, the manner in
which Fourth Amendment principles were applied in the
Nebraska Supreme Court is paradigmatic of Congress'

concern respecting attempts by state courts to structure Fourth Amendment jurisprudence so as not to upset convictions of the "guilty" or the "unworthy." As Judge Urbom fully detailed in two thorough and thoughtful opinions in the District Court on Rice's petition for habeas, the affidavit upon which the Omaha police obtained a warrant and thereby searched Rice's apartment was clearly deficient under prevailing constitutional standards, and no extant exception to the warrant requirement justified the search absent a valid warrant. Yet the Nebraska Supreme Court upheld the search on the alternative and patently untenable ground that there is no Fourth Amendment violation if a defective warrant is supplemented *at a suppression hearing* by facts that theoretically could have been, but were not, presented to the issuing magistrate. Such a construction of the Fourth Amendment would obviously abrogate the warrant requirement of the Fourth Amendment and the principle that its "protection consists in requiring that those inferences [as to whether the data available justify an intrusion upon a person's privacy] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States,* 333 U. S. 10, 14 (1948). Yet the Court today, by refusing to reaffirm our precedents, see *ante,* at 473 n. 3, even casts some doubt on that heretofore unquestioned precept of Fourth Amendment jurisprudence that "an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate. See *Aguilar* v. *Texas,* 378 U. S. 108, 109 n. 1. A contrary rule would, of course, render the warrant requirements of the Fourth Amendment meaningless." *Whiteley* v. *Warden,* 401 U. S., at 565

n. 8. Of course, for the Court strongly to reiterate the fundamentality of this principle would only highlight the Nebraska Supreme Court's distortion of the Fourth Amendment in an emotionally charged case, and thereby accentuate the general potential for erroneous state-court adjudication of Fourth Amendment claims.[20]

### III

Other aspects of today's decision are deserving of comment but one particularly merits special attention. For the Court's failure to limit today's ruling to prospective application stands in sharp contrast to recent cases that have so limited decisions expanding or affirming constitutional rights. Respondents, relying on the explicit holding of *Fay* v. *Noia,* 372 U. S. 391 (1963), that a petition for a writ of certiorari is not a necessary predicate for federal habeas relief, and accepting at face value the clear import of our prior habeas cases that all unconstitutional confinements may be challenged on federal habeas, contend that any new restriction on state prisoners' ability to obtain habeas relief should be held to be prospective only. The Court, however, dismisses respondents' effective inability to have a single federal court pass on their federal constitutional claims with the offhand remark that "respondents were, of course, free to file a timely petition for certiorari prior to seeking federal habeas corpus relief." *Ante,* at 495 n. 38. To be sure, the fact that the time limits for invoking our certiorari jurisdiction with respect to criminal cases emanating from state courts are

---

[20] The Nebraska Supreme Court fell into patent error in citing *Whiteley* for the proposition that "the affidavit may be supplemented by testimony of additional evidence known to the police." *State* v. *Rice,* 188 Neb. 728, 739, 199 N. W. 2d 480, 488 (1972).

*non*-jurisdictional would dictate that respondents are at least free to file out-of-time certiorari petitions; under the Court's "direct review" distinction delineated today, we would still have authority to address the substance of respondents' eminently and concededly meritorious Fourth Amendment claims. Of course, federal review by certiorari in this Court is a matter of grace, and it is grace now seldom bestowed at the behest of a criminal defendant. I have little confidence that three others of the Brethren would join in voting to grant such petitions, thereby reinforcing the notorious fact that our certiorari jurisdiction is inadequate for containing state criminal proceedings within constitutional bounds and underscoring Congress' wisdom in mandating a broad federal habeas jurisdiction for the district courts. In any event, since we are fully familiar with the records in these cases, respondents are owed at least review in this Court, particularly since it shuts the doors of the district courts in a decision that marks such a stark break with our precedents on the scope of habeas relief; indeed, if the Court were at all disposed to safeguard constitutional rights and educate state and federal judges concerning the contours of Fourth Amendment jurisprudence in various situations, it would decide these cases on the merits rather than employ a procedural ruse that ensures respondents' continued unconstitutional confinement.

## IV

In summary, while unlike the Court I consider that the exclusionary rule is a constitutional ingredient of the Fourth Amendment, any modification of that rule should at least be accomplished with some modicum of logic and justification not provided today. See, *e. g.,* Dershowitz & Ely, *Harris* v. *New York:* Some Anxious Observations

on the Candor and Logic of the Emerging Nixon Majority, 80 Yale L. J. 1198 (1971). The Court does not disturb the holding of *Mapp* v. *Ohio* that, as a matter of federal constitutional law, illegally obtained evidence must be excluded from the trial of a criminal defendant whose rights were transgressed during the search that resulted in acquisition of the evidence. In light of that constitutional rule it is a matter for Congress, not this Court, to prescribe what federal courts are to review state prisoners' claims of constitutional error committed by state courts. Until this decision, our cases have never departed from the construction of the habeas statutes as embodying a congressional intent that, however substantive constitutional rights are delineated or expanded, those rights may be asserted as a procedural matter under federal habeas jurisdiction. Employing the transparent tactic that today's is a decision construing the Constitution, the Court usurps the authority—vested by the Constitution in the Congress—to reassign federal judicial responsibility for reviewing state prisoners' claims of failure of state courts to redress violations of their Fourth Amendment rights. Our jurisdiction is eminently unsuited for that task, and as a practical matter the only result of today's holding will be that denials by the state courts of claims by state prisoners of violations of their Fourth Amendment rights will go unreviewed by a federal tribunal. I fear that the same treatment ultimately will be accorded state prisoners' claims of violations of other constitutional rights; thus the potential ramifications of this case for federal habeas jurisdiction generally are ominous. The Court, no longer content just to restrict forthrightly the constitutional rights of the citizenry, has embarked on a campaign to water down even such constitutional rights as it purports to acknowledge

by the device of foreclosing resort to the federal habeas remedy for their redress.

I would affirm the judgments of the Courts of Appeals.

Mr. Justice White, dissenting.

For many of the reasons stated by Mr. Justice Brennan, I cannot agree that the writ of habeas corpus should be any less available to those convicted of state crimes where they allege Fourth Amendment violations than where other constitutional issues are presented to the federal court. Under the amendments to the habeas corpus statute, which were adopted after *Fay* v. *Noia*, 372 U. S. 391 (1963), and represented an effort by Congress to lend a modicum of finality to state criminal judgments, I cannot distinguish between Fourth Amendment and other constitutional issues.

Suppose, for example, that two confederates in crime, Smith and Jones, are tried separately for a state crime and convicted on the very same evidence, including evidence seized incident to their arrest allegedly made without probable cause. Their constitutional claims are fully aired, rejected, and preserved on appeal. Their convictions are affirmed by the State's highest court. Smith, the first to be tried, does not petition for certiorari, or does so but his petition is denied. Jones, whose conviction was considerably later, is more successful. His petition for certiorari is granted and his conviction reversed because this Court, without making any new rule of law, simply concludes that on the undisputed facts the arrests were made without probable cause and the challenged evidence was therefore seized in violation of the Fourth Amendment. The State must either retry Jones or release him, necessarily because he is deemed in custody in violation of the Constitution. It turns out that without the evidence illegally seized, the State has no case;

and Jones goes free. Smith then files his petition for habeas corpus. He makes no claim that he did not have a full and fair hearing in the state courts, but asserts that his Fourth Amendment claim had been erroneously decided and that he is being held in violation of the Federal Constitution. He cites this Court's decision in Jones' case to satisfy any burden placed on him by § 2254 to demonstrate that the state court was in error. Unless the Court's reservation, in its present opinion, of those situations where the defendant has not had a full and fair hearing in the state courts is intended to encompass all those circumstances under which a state criminal judgment may be re-examined under § 2254—in which event the opinion is essentially meaningless and the judgment erroneous—Smith's petition would be dismissed, and he would spend his life in prison while his colleague is a free man. I cannot believe that Congress intended this result.

Under the present habeas corpus statute, neither Rice's nor Powell's application for habeas corpus should be dismissed on the grounds now stated by the Court. I would affirm the judgments of the Courts of Appeals as being acceptable applications of the exclusionary rule applicable in state criminal trials by virtue of *Mapp* v. *Ohio,* 367 U. S. 643 (1961).

I feel constrained to say, however, that I would join four or more other Justices in substantially limiting the reach of the exclusionary rule as presently administered under the Fourth Amendment in federal and state criminal trials.

Whether I would have joined the Court's opinion in *Mapp* v. *Ohio, supra,* had I then been a Member of the Court, I do not know. But as time went on after coming to this bench, I became convinced that both

*Weeks* v. *United States,* 232 U. S. 383 (1914), and *Mapp* v. *Ohio* had overshot their mark insofar as they aimed to deter lawless action by law enforcement personnel and that in many of its applications the exclusionary rule was not advancing that aim in the slightest, and that in this respect it was a senseless obstacle to arriving at the truth in many criminal trials.

The rule has been much criticized and suggestions have been made that it should be wholly abolished, but I would overrule neither *Weeks* v. *United States* nor *Mapp* v. *Ohio.* I am nevertheless of the view that the rule should be substantially modified so as to prevent its application in those many circumstances where the evidence at issue was seized by an officer acting in the good-faith belief that his conduct comported with existing law and having reasonable grounds for this belief. These are recurring situations; and recurringly evidence is excluded without any realistic expectation that its exclusion will contribute in the slightest to the purposes of the rule, even though the trial will be seriously affected or the indictment dismissed.

An officer sworn to uphold the law and to apprehend those who break it inevitably must make judgments regarding probable cause to arrest: Is there reasonable ground to believe that a crime has been committed and that a particular suspect has committed it? Sometimes the historical facts are disputed or are otherwise in doubt. In other situations the facts may be clear so far as they are known, yet the question of probable cause remains. In still others there are special worries about the reliability of secondhand information such as that coming from informants. In any of these situations, which occur repeatedly, when the officer is convinced that he has probable cause to arrest he will very

likely make the arrest. Except in emergencies, it is probable that his colleagues or superiors will participate in the decision, and it may be that the officer will secure a warrant, although warrantless arrests on probable cause are not forbidden by the Constitution or by state law. Making the arrest in such circumstances is precisely what the community expects the police officer to do. Neither officers nor judges issuing arrest warrants need delay apprehension of the suspect until unquestioned proof against him has accumulated. The officer may be shirking his duty if he does so.

In most of these situations, it is hoped that the officer's judgment will be correct; but experience tells us that there will be those occasions where the trial or appellate court will disagree on the issue of probable cause, no matter how reasonable the grounds for arrest appeared to the officer and though reasonable men could easily differ on the question. It also happens that after the events at issue have occurred, the law may change, dramatically or ever so slightly, but in any event sufficiently to require the trial judge to hold that there was not probable cause to make the arrest and to seize the evidence offered by the prosecution. It may also be, as in the *Powell* case now before us, that there is probable cause to make an arrest under a particular criminal statute but when evidence seized incident to the arrest is offered in support of still another criminal charge, the statute under which the arrest and seizure were made is declared unconstitutional and the evidence ruled inadmissible under the exclusionary rule as presently administered.

In these situations, and perhaps many others, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that in each of them the officer is acting as a

reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty. It is true that in such cases the courts have ultimately determined that in their view the officer was mistaken; but it is also true that in making constitutional judgments under the general language used in some parts of our Constitution, including the Fourth Amendment, there is much room for disagreement among judges, each of whom is convinced that both he and his colleagues are reasonable men. Surely when this Court divides five to four on issues of probable cause, it is not tenable to conclude that the officer was at fault or acted unreasonably in making the arrest.

When law enforcement personnel have acted mistakenly, but in good faith and on reasonable grounds, and yet the evidence they have seized is later excluded, the exclusion can have no deterrent effect. The officers, if they do their duty, will act in similar fashion in similar circumstances in the future; and the only consequence of the rule as presently administered is that unimpeachable and probative evidence is kept from the trier of fact and the truth-finding function of proceedings is substantially impaired or a trial totally aborted.

Admitting the evidence in such circumstances does not render judges participants in Fourth Amendment violations. The violation, if there was one, has already occurred and the evidence is at hand. Furthermore, there has been only mistaken, but unintentional and faultless, conduct by enforcement officers. Exclusion of the evidence does not cure the invasion of the defendant's rights which he has already suffered. Where an arrest has been made on probable cause but the defendant is acquitted, under federal law the defendant has no right to damages simply because his innocence has been

proved. "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." *Pierson* v. *Ray,* 386 U. S. 547, 555 (1967). The officer is also excused from liability for "acting under a statute that he reasonably believed to be valid but that was later held unconstitutional, on its face or as applied." *Ibid.* There is little doubt that as far as civil liability is concerned, the rule is the same under federal law where the officer mistakenly but reasonably believes he has probable cause for an arrest. In *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974), the Court announced generally that officers of the executive branch of the government should be immune from liability where their action is reasonable "in light of all the circumstances, coupled with good-faith belief." *Id.,* at 247–248. The Court went on to say:

> "Public officials, whether governors, mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all." *Id.,* at 241–242 (footnote omitted).

The Court has proceeded on this same basis in other contexts. *O'Connor* v. *Donaldson,* 422 U. S. 563 (1975); *Wood* v. *Strickland,* 420 U. S. 308 (1975).

If the defendant in criminal cases may not recover for a mistaken but good-faith invasion of his privacy, it

makes even less sense to exclude the evidence solely on his behalf. He is not at all recompensed for the invasion by merely getting his property back. It is often contraband and stolen property to which he is not entitled in any event. He has been charged with crime and is seeking to have probative evidence against him excluded, although often it is the instrumentality of the crime. There is very little equity in the defendant's side in these circumstances. The exclusionary rule, a judicial construct, seriously shortchanges the public interest as presently applied. I would modify it accordingly.